THE STATE OF OHIO, APPELLEE, *v.* CONWAY, APPELLANT.

[Cite as *State v. Conway,* 109 Ohio St.3d 412, 2006-Ohio-2815.]

(No. 2003–1964—Submitted January 10, 2006—Decided June 21, 2006.)

ALICE ROBIE RESNICK, J.

{¶ 1} In September 2001, James T. Conway III, defendant-appellant, killed Andrew Dotson with a pickax. A jury convicted Conway of aggravated murder and recommended the death penalty, and Conway was sentenced to death.

## I. Facts and Case History

{¶ 2} On Friday, September 14, 2001, Jesse James was shot and wounded near the intersections of Evergreen, Fern Hill, and Palmetto Streets on the west side of Columbus. James, who was a witness for the defense, said that Dotson was at the scene of the shooting with a "big, fat white guy," a description that matches Conway. James said that the "big, fat white guy" had a gun. Later that evening, Dotson's mother and his brother picked up Dotson's car on Evergreen, where it was parked.

{¶ 3} On Saturday, September 15, 2001, two Franklin County detectives went to the home of Dotson's mother, Lora Eberhard. Eberhard told the detectives that Dotson was not there but that she was expecting him. She gave the detectives Dotson's home address and cell phone number, and they left a business card. Dotson arrived at Eberhard's home a few hours later with Jamie Horton and another person in a white Jeep Cherokee. Eberhard gave Dotson the detectives' business card, and she left to go to church. This was the last time Eberhard saw or spoke to Dotson. One of the last calls from Dotson's cell phone was made later that evening to the Franklin County Sheriff's Detective Bureau.

{¶ 4} Under a plea agreement, Mike Arthurs, a co-conspirator of Conway's, testified that sometime in mid-September 2001, he had attended a party at the Hampton Inn in Chillicothe with Conway, Dotson, Horton, and Shawn Nightingale. During the party, Conway met secretly with Arthurs and Nightingale in the bathroom of their hotel room and asked them to kill Dotson. Conway gave no reason for wanting Dotson killed, but Arthurs and Nightingale nevertheless agreed to carry out the murder.

{¶ 5} The group spent the night at the hotel, and the next morning, Conway, Dotson, Arthurs, Nightingale, and Horton met in the hotel parking lot. Conway and Horton left in Conway's car. Arthurs and Nightingale drove to West Virginia in Nightingale's Jeep Cherokee with Dotson to kill him.

{¶ 6} After they arrived in West Virginia, Arthurs and Nightingale realized that they could not kill Dotson. Arthurs testified that Dotson wanted drugs, so

the group picked up some pills. Dotson started taking the pills and subsequently passed out in the back seat of Nightingale's Jeep.

{¶ 7} Arthurs and Nightingale decided to drive to Columbus. During the trip, they called Conway to tell him that they could not kill Dotson. According to Arthurs, Conway told him and Nightingale to "quit being bitches" and instructed them to bring Dotson to a shopping center on the west side of Columbus.

{¶ 8} Dotson was still passed out when Arthurs and Nightingale met Conway and Horton in the shopping center parking lot after dark. Conway directed Arthurs and Nightingale to follow him to a nearby cornfield on Galloway Road. Once at the cornfield, Conway ordered Arthurs to pull Dotson out of Nightingale's Jeep and choke him, which Arthurs said he pretended to do. Conway then had Arthurs and Horton drag Dotson further into the cornfield. Arthurs said that Dotson was unconscious but still breathing after he was dragged into the cornfield.

{¶ 9} Horton and Nightingale then removed Dotson's clothes, except for his underwear, and placed them in a plastic bag. At this point, Conway took a pickax from his truck and walked into the cornfield where Dotson was. Arthurs could not see Conway but testified that he heard "two thuds." After Arthurs heard the thuds, Conway reappeared and removed blood from the pickax by wiping it in the dirt. Conway broke apart the pickax, placed the metal part of the pickax into the plastic bag containing Dotson's clothes, and put the handle in his truck. Horton then removed a bag of lime from Nightingale's Jeep and poured the lime over Dotson's body. The group then left Dotson's body in the cornfield.

{¶ 10} After leaving the cornfield, Arthurs disposed of Dotson's clothes and part of the pickax in the trash behind his cousin's house. The next morning, Conway, Horton, and Nightingale picked up Arthurs, and they drove to a hardware store. While there, Conway picked up a spaded shovel and told Arthurs that "it was for the next time." Conway later admitted to Arthurs that he had stabbed Dotson twice in the chest with the pickax.

{¶ 11} Thereafter, the group went to the mall, where Conway bought Arthurs new clothes and new shoes. Conway then took the clothes that Arthurs had worn when Dotson was killed and said that he was going to burn them.

{¶ 12} Ronny Trent, Conway's cellmate at the Franklin County Corrections Center, also testified against Conway under a plea agreement. Trent testified that he and Conway had never met prior to their joint incarceration. Soon after discovering that Trent was a distant cousin, however, Conway began confiding in him.

{¶ 13} In April 2002, before Conway was charged with Dotson's murder, Dotson's mother visited Conway in jail, seeking information about her son's death. After telling Trent that Dotson's mom had just visited him, Conway said, "That stupid bitch actually thinks I'm going to tell her I killed her son." Conway later told Trent that he had killed Dotson because he was afraid that Dotson would tell the police that Conway had shot someone "in the butt" at a White Castle restaurant.

{¶ 14} Trent testified that Conway had instructed Arthurs and Nightingale to take Dotson to West Virginia, cause him to overdose on drugs, and dump his body in the hills. When Arthurs and Nightingale could not kill Dotson, they brought him back to Columbus and met Conway and Horton. Conway originally told Trent that he had stepped on Dotson's neck until Dotson died. Conway later admitted to Trent, however, that he had struck Dotson twice in the chest with a pickax "to be sure that Andrew was dead."

{¶ 15} Trent also said that Conway hired him to kill Arthurs because Conway feared that Arthurs would tell the police about Dotson's murder. Conway paid Trent $5,000 by having the money placed in Trent's jail account. However, instead of killing Arthurs, Trent went to the prosecutor and began working as a confidential informant gathering incriminating information on Conway.

{¶ 16} Gary Wilgus, a special agent with the Ohio Bureau of Criminal Investigation, was called to an area off Galloway Road in Franklin County on October 10, 2001. There, Wilgus saw the badly decomposed body of a white male lying in a cornfield. The body was undressed except for a pair of boxer shorts. The victim's left foot was missing, and Wilgus speculated that it had been removed by an animal. Wilgus noticed a white powder on and around the body, which was later identified as a cement-type material.

{¶ 17} Wilgus took pictures of the body and crime scene. Because of decomposition, the victim's face was unrecognizable. Wilgus attempted to identify the body through fingerprints but was unsuccessful. The body was later identified as Dotson's through his dental records.

{¶ 18} Dr. Patrick Fardal, chief forensic pathologist and deputy coroner for Franklin County, determined that Dotson had died as a result of two stab wounds to his chest that pierced his heart and liver. Both wounds were substantially similar and appeared to have been caused by the same instrument. Dotson's wounds were consistent with those that would be inflicted by an instrument such as a pickax. Fardal also compared Dotson's wounds with a pickax purchased by Arthurs that was offered into evidence as similar to the pickax used in the murder. Fardal found that the pickax purchased by Arthurs could have been the type of instrument that caused Dotson's chest wounds.

{¶ 19} During the autopsy, Fardal found blood in Dotson's chest cavity, indicating that he was still alive when he sustained his stab wounds. No evidence suggested that Dotson was killed by strangulation. Fardal also noted that when Dotson's body was discovered, it was partially covered with a "powdered whitish, gray material" that looked like lime or concrete powder. The toxicology report showed that alcohol and Valium were present in Dotson's body.

{¶ 20} In June 2002, Conway was indicted on six counts, including one count of aggravated murder. Count One charged that Conway had purposely and with prior calculation and design caused the death of Dotson, R.C. 2903.01(A), and/or that Conway had purposely caused the death of Dotson during a kidnapping, R.C. 2903.01(B). Count Two charged Conway with kidnapping. R.C. 2905.01(A)(2) and (3). Conway was charged in Count Three with possession of criminal tools, R.C. 2923.24(A); Count Four, abuse of a corpse, R.C. 2927.01(B); Count Five, obstruction of justice, R.C. 2921.32(A)(4) and (C)(4); and Count Six, tampering with evidence, R.C. 2921.12(A)(1).

{¶ 21} The aggravated murder count contained three death-penalty specifications. Specification one charged that the aggravated murder was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense. R.C. 2929.04(A)(3). Specification two charged aggravated murder during a kidnapping. R.C. 2929.04(A)(7). Specification three charged that the aggravated murder was committed to prevent the victim from testifying in a criminal proceeding. R.C. 2929.04(A)(8).

{¶ 22} The defense theory of the case was that Arthurs had already killed Dotson before Conway struck him with the pickax. Defense counsel extensively cross-examined Arthurs and challenged Dr. Fardal's conclusion that Dotson had died from being stabbed twice in the chest. The defense also called seven witnesses.

{¶ 23} James testified for the defense and said that he was shot at the corner of Evergreen and Palmetto Streets on September 14, 2001. James drove his maroon Ford Explorer to this location after Dotson called him. James said that the shooting occurred in a residential neighborhood, and no White Castle restaurant was nearby.

{¶ 24} James has never been able to identify his shooter. Moreover, James never identified Conway as being at the scene of the shooting. Although James testified that "a big, fat white guy" was with Dotson at the scene, he has never said that that person was Conway. To James's knowledge, the police have never filed any charges regarding his shooting.

{¶ 25} Robert Hale testified that he lives on Evergreen Terrace, about 100 to 200 feet from the corner of Evergreen and Palmetto. On September 14, 2001, Hale was about 150 feet from this intersection when he heard five loud gunshots.

Hale then saw a young man run and jump into a maroon Ford Explorer. As the Explorer sped away, Hale heard nine more shots from a different gun. Hale did not see who was doing the shooting.

{¶ 26} Linda Goodman, the general manager at the Hampton Inn Suites in Chillicothe, testified about a hotel billing record. The bill indicated that Arthurs checked into room number 306 at 10:31 p.m. on September 11, 2001, and checked out on September 15, 2001, at 1:44 p.m. Goodman also stated that it was hotel policy to require photo identification if the hotel guest paid with cash.

{¶ 27} Brian Woodworth, a maintenance worker at the Chillicothe Hampton Inn, measured the dimensions of the bathroom in room 306. Woodworth said that the bathroom measured slightly over ten feet by five and one-half feet and that the "surface area for the standing room" in the bathroom was about three and one-half by five and one-half feet. According to Woodworth, three large adult males would be able to stand in the bathroom at the same time, but "it would be tight."

{¶ 28} Arthur Wood testified that Dotson was his "adopted cousin." Wood was a fellow inmate of Arthurs, and he claimed that Arthurs admitted killing Dotson. Wood, however, conceded that he did not know whether Arthurs was telling the truth.

{¶ 29} The jury convicted Conway of all charges and specifications. After a penalty hearing, the trial court sentenced Conway to death, consistently with the jury's recommendation, for the aggravated murder of Dotson. The trial court merged Conway's kidnapping conviction (Count Two) into his aggravated murder conviction and did not impose a separate sentence on Count Two. The trial court imposed sentences of one year for each of Conway's convictions for possessing criminal tools (Count Three) and abuse of a corpse (Count Four), and five years for each of Conway's convictions for obstructing justice (Count Five) and tampering with evidence (Count Six). The trial court ordered that the sentences for Counts Three through Six run consecutively to each other and concurrently with the sentence for Count One.

{¶ 30} The cause is now before this court on direct review from the trial court. R.C. 2929.05(A).

{¶ 31} Conway has raised eight propositions of law. We have reviewed each one and have determined that none justifies reversal of Conway's convictions. Pursuant to R.C. 2929.05(A), we have also independently weighed the aggravating circumstances against the mitigating evidence. We find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Therefore, we affirm Conway's convictions and sentence of death.

## II. Pretrial Publicity

{¶ 32} In his fourth proposition of law, Conway contends that the trial court's denial of his motion to change venue deprived him of a fair and impartial jury. Conway claims that adverse publicity surrounding both his trial in this matter and a prior murder conviction and death sentence required that venue be moved from Franklin County.

{¶ 33} A motion for change of venue is governed by Crim.R. 18(B), which provides that a trial court may transfer venue "when it appears that a fair and impartial trial cannot be held" in that court. See, also, R.C. 2901.12(K). "A change of venue rests largely in the discretion of the trial court * * *." *State v. Fairbanks* (1972), 32 Ohio St.2d 34, 37, 61 O.O.2d 241, 289 N.E.2d 352. Moreover, " 'a careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' " *State v. Davis* (1996), 76 Ohio St.3d 107, 111, 666 N.E.2d 1099, quoting *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 357 N.E.2d 1035. Accord *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304; *State v. Landrum* (1990), 53 Ohio St.3d 107, 117, 559 N.E.2d 710.

{¶ 34} Before trial, defense counsel filed a motion to change venue under Crim.R. 18(B). During a pretrial hearing in July 2003, the trial judge indicated that he saw no reason to change venue. When juror selection began on September 15, 2003, defense counsel moved for a continuance and a change of venue based on various media reports about the trial and Conway's prior aggravated-murder conviction and death sentence. During trial, defense counsel also submitted to the court newspaper articles about the crimes.

{¶ 35} The trial court deferred ruling on defense counsel's motions for a continuance and a change of venue until voir dire was completed. After prospective jurors were individually questioned about pretrial publicity, the trial court denied these motions.

{¶ 36} Some newspaper articles were adverse to Conway. These articles described Conway's criminal background, including his prior murder conviction and death sentence, his alleged plans to kill witnesses and prosecutors, allegations that he was the leader of a criminal gang, and details of the charges against Conway in this case. Other articles described Conway as a father of two young children and a college student, or mentioned him only peripherally.

{¶ 37} Notwithstanding the publicity before and during the trial, Conway has not shown that the trial court erred in failing to change venue. The trial court conducted individual voir dire of prospective jurors to determine the extent of their exposure to media coverage involving Conway. Only 14 of 60 venire members indicated that they had read or heard anything about this case or Conway's prior murder conviction and death sentence. Defense counsel chal-

lenged four of these jurors, and the trial court readily dismissed those jurors. Defense counsel did not challenge any other prospective juror based on exposure to adverse media coverage about Conway. Cf. *Murphy v. Florida* (1975), 421 U.S. 794, 803, 95 S.Ct. 2031, 44 L.Ed.2d 589; *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 92–93.

{¶ 38} Defense counsel also did not exhaust their peremptory challenges. The limited number of defense challenges for pretrial publicity and the failure to exhaust peremptory challenges indicate that the defense did not believe that the jury venire was overly exposed to negative publicity. See, e.g., *State v. Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 37.

{¶ 39} Moreover, none of the seated jurors indicated they had any knowledge about this case or Conway's other criminal activities. A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased. See *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749; *State v. Ahmed,* 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, at ¶ 40–41. Conway is unable to demonstrate that any biased juror sat on his jury.

{¶ 40} The trial court took other precautions. The court granted one continuance to allow publicity from Conway's first capital trial to dissipate. The court also continually cautioned jurors not to discuss the case and to avoid media reports. Under these circumstances, we hold that the trial court did not abuse its discretion by declining to change venue. The trial court took effective steps to protect Conway's rights. *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, at ¶ 47–58; *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 30. Therefore, we reject Conway's fourth proposition.

### III. Guilt–Phase Issues

### A. Sufficiency of Evidence

{¶ 41} In his second proposition of law, Conway challenges the sufficiency of the evidence regarding the R.C. 2929.04(A)(3) (murder to escape detection) and 2929.04(A)(8) (murder to prevent testimony) capital specifications contained in the indictment.

{¶ 42} In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. The weight to be given the evidence and the credibility of witnesses are primarily jury issues. *State v. Waddy* (1992), 63 Ohio

St.3d 424, 430, 588 N.E.2d 819; *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212.

{¶ 43} *R.C. 2929.04(A)(3).* The first capital specification charged Conway with committing aggravated murder "for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender," R.C. 2929.04(A)(3), which was the felonious assault upon James. Conway contends that the state failed to present sufficient evidence that he had committed that felonious assault.

{¶ 44} In *State v. Jones* (2001), 91 Ohio St.3d 335, 347, 744 N.E.2d 1163, this court held that proof of the defendant's commission of the prior offense constituted an essential element of the R.C. 2929.04(A)(3) specification. Thus, the state was required to prove beyond a reasonable doubt that Conway committed the offense of felonious assault for which he had sought to avoid detection, apprehension, trial, or punishment.

{¶ 45} The state presented testimony from Ronny Trent (Conway's cousin and a government informant) that Conway was afraid that Dotson would tell the police that Conway had shot someone. Conway also told Trent that he had killed Dotson because Dotson had seen Conway shoot someone.

{¶ 46} James testified that he was shot on September 14, 2001. James said that Dotson was at the scene of the shooting with a "big, fat white guy," a description that matches Conway, and that the "big, fat white guy" had a gun. James also testified that the shooting occurred at Evergreen and Palmetto in Columbus. On September 14, police recovered multiple shell casings from that area.

{¶ 47} R.C. 2903.11(A)(2) defines felonious assault as knowingly causing or attempting to cause serious physical harm to another by means of a deadly weapon. Construing the evidence in a light most favorable to the prosecution, a rational juror could have concluded beyond a reasonable doubt that Conway had feloniously assaulted Jesse James. Therefore, we find that sufficient evidence was presented to prove this element of R.C. 2929.04(A)(3).

{¶ 48} *R.C. 2929.04(A)(3) Jury Instruction.* Under this proposition of law, Conway also contends that the jury was not instructed that a finding on the felonious-assault charge was necessary to convict on the R.C. 2929.04(A)(3) specification. After defining the offense of felonious assault in conjunction with the R.C. 2929.04(A)(3) specification, the trial court instructed:

{¶ 49} "Now, felonious assault can also be committed, the State of Ohio, and that's the felonious assault that—you aren't deciding that offense before you, but the State must prove that it was intended to, with respect to that specification, that a felonious assault—the State has to show that the offense was committed

for the purpose of escaping detection, apprehension, trial, [or] punishment for another offense and the other offense is the felonious assault."

{¶ 50} Conway complains about the trial court's instruction to the jury "[Y]ou aren't deciding that offense [felonious assault] before you * * *."

{¶ 51} The challenged instruction is less than a model of clarity. Nevertheless, Conway failed to object to this instruction and has waived all but plain error. Crim.R. 52(B); *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. A trial court's failure to properly instruct on every essential element of a crime does not, per se, constitute plain error under Crim.R. 52(B). *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144, paragraph two of the syllabus. It is only when the failure to properly instruct results in a "manifest miscarriage of justice" that plain error may be recognized. Id. at paragraph three of the syllabus.

{¶ 52} We conclude that there was no prejudice to Conway resulting in a manifest miscarriage of justice. The state did present sufficient evidence to prove beyond a reasonable doubt that Conway had committed a felonious assault. Thus, plain error is absent because the outcome of the trial would not clearly have been different with a more precise instruction. See *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 53} *R.C. 2929.04(A)(8).* Conway also maintains that the state failed to present sufficient evidence to prove the third capital specification, that he killed Dotson to prevent his "testimony in any criminal proceeding." R.C. 2929.04(A)(8). Conway contends that the (A)(8) specification is inapplicable because there was no evidence that Conway was a suspect in the shooting of Jesse James, and no criminal proceeding regarding the James shooting was underway.

{¶ 54} R.C. 2929.04(A)(8) allows the death penalty if "[t]he victim of the aggravated murder was a witness to an offense who was purposely killed to prevent the victim's testimony in any criminal proceeding and the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness."

{¶ 55} Under the R.C. 2929.04(A)(8) specification, the state was not required to show that Conway was a suspect or that he had committed any underlying offense in order to prove the witness-murder specification. In addition, R.C. 2929.04(A)(8) does not require that a criminal action be pending when the defendant kills the victim-witness. Indeed, we have previously upheld application of the witness-murder specification in situations where no criminal proceeding had been initiated at the time the victim was murdered. See, e.g., *State v. Keene* (1998), 81 Ohio St.3d 646, 655, 693 N.E.2d 246; *State v. Brooks* (1996), 75 Ohio

St.3d 148, 159, 661 N.E.2d 1030; *State v. Hooks* (1988), 39 Ohio St.3d 67, 69, 529 N.E.2d 429. The plain language of the statute requires only (1) that the victim was a witness to an offense and (2) that the purpose of killing the victim was to prevent the victim from testifying in a criminal proceeding. See *State v. Yarbrough,* 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, at ¶ 126.

{¶ 56} James testified that he was shot on September 14, 2001, and that Dotson was at the scene. Trent testified that Conway was afraid that Dotson would tell the police that Conway had shot someone. Conway told Trent that he had killed Dotson because Dotson had seen Conway shoot someone. In addition, Arthurs testified that Conway was concerned that Dotson would disclose Conway's criminal activities. Finally, the state presented evidence that one of the last calls made on Dotson's cell phone was to a Franklin County Sheriff's detective. This call was made on September 15, 2001, one day after the James shooting. Construing the evidence in a light most favorable to the state, we hold that sufficient evidence was presented to prove the R.C. 2929.04(A)(8) specification. Therefore, we overrule Conway's second proposition.

## B.  Hearsay

{¶ 57} Conway argues in his sixth proposition of law that the trial court erred in admitting hearsay testimony when it permitted two witnesses to testify that Dotson had been involved in a shooting and that detectives had wanted to speak with him.

{¶ 58} Lora Eberhard, Dotson's mother, testified that on September 15, 2001, two Franklin County Sheriff's detectives came to her house looking for Dotson. According to Eberhard, the detectives told her that "they believed [that Dotson] was witness to a shooting and they wanted to talk about it." Defense counsel objected, and the judge gave the jury during Eberhard's testimony a lengthy explanation of the law concerning hearsay. Similarly, Cecil Dotson, Dotson's brother, was permitted to testify that Roberta Hannah, Dotson's girlfriend, told him "that there was a shooting and that [Dotson] was there." Again, defense counsel objected, and the witness was warned not to relate the statements of others.

{¶ 59} Any errors in admitting these statements were harmless. The testimony of Eberhard and Cecil Dotson was merely cumulative. James testified that Dotson was present when James was shot, and Conway admitted to Trent that Dotson had seen Conway shoot someone and that Conway was afraid that Dotson would tell the police. Therefore, we reject Conway's sixth proposition.

## C.   Other–Acts Evidence

{¶ 60} In his eighth proposition of law, Conway maintains that the trial court improperly admitted "other acts" evidence in violation of Evid.R. 404(B). He also

argues that the probative value of this evidence was substantially outweighed by the risk of unfair prejudice. Evid.R. 403(A).

### 1. Evid.R. 404(B): Other Crimes, Wrongs, or Acts

{¶ 61} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Evid.R. 404(B). Such evidence may be admissible, however, for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Id. The exceptions allowing the evidence "must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.

{¶ 62} Nevertheless, the admission of evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice. *State v. Issa* (2001), 93 Ohio St.3d 49, 64, 752 N.E.2d 904. Thus, our inquiry is confined to determining whether the trial court acted unreasonably, arbitrarily, or unconscionably in deciding the evidentiary issues about which Conway complains. *State v. Barnes*, 94 Ohio St.3d at 23, 759 N.E.2d 1240.

{¶ 63} *Hannah's testimony.* Conway first complains about Hannah's testimony regarding an incident during which Conway yelled at Dotson. Hannah testified that on one occasion, she accompanied Dotson to meet Conway. As they were leaving a neighborhood in separate vehicles, Conway stopped at the side of the road and yelled at Dotson for following him. Conway did not object to this testimony and waived all but plain error. Crim.R. 52(B); *State v. Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240.

{¶ 64} This evidence was relevant to a noncharacter issue and was allowed under Evid.R. 404(B). Hannah's testimony indicated that Conway distrusted Dotson. The testimony was probative of Conway's motive to kill. See, e.g., *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, at ¶ 81; *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 161, 749 N.E.2d 226. Therefore, we conclude that there was no plain error.

{¶ 65} *Arthurs's testimony.* Conway argues that the trial court erred in allowing Arthurs to testify about a statement that Conway made the day after Dotson's murder. Arthurs testified that he and Conway were at a hardware store where Conway picked up a spaded shovel and said that "it was for the next time." Conway objected, but we find that there was no error.

{¶ 66} Conway's reference to the spaded shovel and "the next time" was a thinly veiled reference to his murder of Dotson with a pickax the previous night. Accordingly, Conway's statement to Arthurs was an implied admission of guilt

and was not barred by Evid.R. 404(B). Cf. *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 47.

{¶ 67} Conway also challenges Arthurs's testimony about faking his murder with the help of Franklin County Sheriff's detectives. Over objection, Arthurs testified, "[The detectives] asked me to dig my own grave and let them take pictures of me in it because * * * [Conway] had hired someone to kill me."

{¶ 68} The trial court did not err in admitting this testimony. Trent testified that Conway had hired him to kill Arthurs because Conway was afraid that Arthurs would implicate Conway in Dotson's murder. Evidence of conduct designed to impede or prevent a witness from testifying is admissible to show consciousness of guilt. *State v. Williams* (1997), 79 Ohio St.3d 1, 11, 679 N.E.2d 646, citing *United States v. Cirillo* (C.A.2, 1972), 468 F.2d 1233, 1240. See, also, *State v. Richey* (1992), 64 Ohio St.3d 353, 357, 595 N.E.2d 915.

{¶ 69} ***Trent's testimony.*** First, Conway complains about Trent's testimony regarding his initial conversations with Conway concerning Dotson's murder. Trent testified that Conway discussed a Chillicothe case and his concerns about people cooperating with police. According to Trent, Conway then said that "he had some people he wanted to take care of." Trent added that "it was like a list, you know, a hit list" and that Conway had then asked Trent to kill Arthurs. The trial court overruled defense counsel's objection.

{¶ 70} Trent's testimony explained how his conversation with Conway turned to the subject of killing Arthurs, who was present when Conway killed Dotson. The evidence that Conway wanted Trent to kill Arthurs to prevent his testimony was admissible to show Conway's consciousness of guilt for Dotson's murder. *State v. Williams,* 79 Ohio St.3d at 11, 679 N.E.2d 646. Thus, the trial court did not commit error.

{¶ 71} Second, Conway complains about Trent's testimony that Conway was afraid that Dotson was going to talk to police about a racketeering case and about seeing Conway shoot someone at a White Castle restaurant. But testimony that Dotson knew of Conway's other criminal acts and that Conway was afraid that Dotson would go to the police was probative of Conway's motive and intent to kill and his identity as Dotson's killer, and it was relevant to the R.C. 2929.04(A)(8) witness-murder specification. See, e.g., *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, at ¶ 47; *State v. Tibbetts,* 92 Ohio St.3d at 161, 749 N.E.2d 226; *State v. McNeill* (1998), 83 Ohio St.3d 438, 442, 700 N.E.2d 596. In addition, the White Castle shooting and the Jesse James shooting were the same offense, and evidence relating to Conway's commission of a felonious assault was necessary to prove the R.C. 2929.04(A)(3) escaping-detection specification. See *State v. Brinkley,* 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, at ¶ 32–34.

{¶ 72} Third, Conway challenges testimony, admitted over objection, that he asked Trent to kill Arthurs because Conway was afraid that Arthurs would tell police about a robbery in Chillicothe and "the thing with [Dotson]."

{¶ 73} As we previously determined, evidence that Conway solicited Trent to kill Arthurs was admissible to show Conway's consciousness of guilt. *State v. Williams,* 79 Ohio St.3d at 11, 679 N.E.2d 646. However, reference to the Chillicothe robbery in relation to Conway's plan to kill Arthurs was irrelevant to the charges in this case and was not admissible under one of the exceptions to Evid.R. 404(B). See, also, Evid.R. 401 and 402.

{¶ 74} Nevertheless, Conway's alleged involvement in this robbery is of minor significance compared to the gravity of the aggravated murder charged in this case. Accordingly, we hold that the admission of this evidence did not result in prejudicial error. See *State v. Bryan,* 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, at ¶ 126–127; *State v. Woodard* (1993), 68 Ohio St.3d 70, 73, 623 N.E.2d 75.

{¶ 75} Fourth, Conway complains of Trent's testimony on redirect examination about a letter that Trent wrote to prosecutors while he and Conway were incarcerated together. Trent testified over objection that he wrote the letter at Conway's request in order to get placed in protective custody so that he could kill a witness against Conway in an unrelated case.

{¶ 76} On cross-examination, defense counsel had inquired into Trent's letter in an effort to impeach Trent regarding his motivation for contacting the prosecutor about the Dotson murder. In cross-examining Trent, defense counsel questioned why Trent's letter to the prosecutor had not implicated Conway in Dotson's murder.

{¶ 77} In *State v. Kamel* (1984), 12 Ohio St.3d 306, 311–312, 12 OBR 378, 466 N.E.2d 860, we held that the prosecutor's cross-examination into the defendant's use of Demerol was permissible because it was the defense that had first raised the subject of defendant's drug problem and made it an issue at trial. We reasoned that after putting the drug problem in issue, defense counsel could not limit the subject to only those points of evidence that were in its favor. "Rather, the topic became open to all relevant inquiry in the discretion of the trial court." Id. at 312, 12 OBR 378, 466 N.E.2d 860, citing, generally, Evid.R. 402.

{¶ 78} In this case, defense counsel first inquired into Trent's letter in an effort to attack his credibility. Thus, Conway cannot now contend that the prosecution was foreclosed from delving into the same subject in an effort to rehabilitate its witness. Admittedly, evidence of Conway's desire to kill a witness in an unrelated murder case reflected very badly on Conway's character. Nevertheless, the evidence was not offered to show propensity or bad character but was

necessary to bolster Trent's claim that it was Conway's idea to write the letter. Accordingly, we hold that the trial court did not err in allowing this testimony.

{¶ 79} Fifth, Conway challenges the following testimony by Trent: "Conway told me he might have a couple other people he might need me to kill." He also challenges Trent's related comment that "now the body count's * * * getting astronomical." Finally, Conway complains about testimony that Trent showed Conway photographs of two people that Trent had purportedly killed for Conway: Arthurs and another "guy that made a video confession for [Conway]."

{¶ 80} Conway failed to object to Trent's "body count" comment and has waived all but plain error. Crim.R. 52(B). Conway did object to Trent's testimony that Conway might want him to kill other people, but not on Evid.R. 404(B) grounds. Thus, he has forfeited all but plain-error analysis by failing to state the specific ground raised on appeal. Evid.R. 103(A)(1); *State v. Tibbetts*, 92 Ohio St.3d at 161, 749 N.E.2d 226, citing *State v. Mason* (1998), 82 Ohio St.3d 144, 159, 694 N.E.2d 932. Conway preserved error as to the remaining testimony about the photographs because the basis for his objection is apparent from the transcript. Evid.R. 103(A)(1).

{¶ 81} Except for the reference to the photograph of Arthurs, none of the complained-of testimony should have been admitted because it did not " 'tend to show' by substantial proof" any of the exceptions under Evid.R. 404(B). See *State v. Broom*, 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus, quoting *State v. Flonnory* (1972), 31 Ohio St.2d 124, 126, 60 O.O.2d 95, 285 N.E.2d 726. Nor do we accept the state's argument that these comments were necessary or relevant to rebut defense counsel's cross-examination of Trent.

{¶ 82} Nevertheless, the admission of Trent's testimony in these instances, although improper, does not rise to the level of prejudicial error. The comments were gratuitous on Trent's part and were not invited by the prosecutor. Moreover, other evidence showing similar acts and intentions of Conway was properly admitted. Thus, we conclude that Conway did not suffer material prejudice from the erroneous admission of this testimony. Cf. *State v. Tibbetts*, 92 Ohio St.3d at 161, 749 N.E.2d 226; *State v. Woodard*, 68 Ohio St.3d at 73, 623 N.E.2d 75.

### 2. Evid.R. 403(A): Unfair Prejudice

{¶ 83} Conway also contends under this proposition of law that the other-acts evidence in his case was highly prejudicial and should have been excluded under Evid.R. 403(A). Yet Conway failed to object on Evid.R. 403(A) grounds to the trial court's admission of other-acts evidence. Thus, he has waived all but plain-error analysis. Evid.R. 103(A)(1); Crim.R. 52(B).

{¶ 84} We determine that the challenged testimony was substantive evidence showing Conway's motive, intent, and identity as Dotson's killer and his con-

sciousness of guilt. See, e.g., *State v. Williams,* 79 Ohio St.3d at 11–12, 679 N.E.2d 646. In light of the substantial relevance of this evidence, the trial court did not commit plain error in allowing relevant testimony of Conway's other acts. Therefore, we overrule Conway's eighth proposition.

## IV. Penalty–Phase Issues

### A. Defense Mitigation Exhibits

{¶ 85} In his third proposition of law, Conway contends that the trial court erred when it prevented the jury from considering defense mitigation exhibits. Conway argues that the trial court should have admitted photographs of him with various family members.

{¶ 86} In the penalty phase, the state objected twice to the defense introduction of these photographs, arguing that they were irrelevant to mitigation and were intended solely to invoke sympathy. No ruling was made on the record, but the trial court did allow Conway's mitigation witnesses to testify about the photos.

{¶ 87} At the close of its mitigation case, the defense moved to admit the photos into evidence. The state again objected on relevancy grounds. In response, defense counsel argued that the photos were relevant evidence of Conway's history and background. The trial court, however, found that the photos were not relevant "to any of the factors that the jury can consider" and granted the state's objection. Defense counsel then proffered the photos for appellate review.

{¶ 88} We hold that the trial court should not have excluded the defense photographs. R.C. 2929.04(B) requires the sentencer to consider "the history, character, and background of the offender." Moreover, R.C. 2929.04(C) grants the defendant great latitude in the introduction of mitigating evidence during death-penalty hearings. See *State v. Dixon,* 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, at ¶ 67.

{¶ 89} The excluded evidence depicted Conway at various stages of his life and included photos of several family members, including Conway's two young children. The photos illustrated testimony that Conway is part of a loving and supportive family and that he maintains a close relationship with his two children. Thus, the photos were relevant mitigating evidence of Conway's history, character, and background under R.C. 2929.04(B), and to "[a]ny other factors" in mitigation under R.C. 2929.04(B)(7). See *State v. White* (1999), 85 Ohio St.3d 433, 448, 709 N.E.2d 140, citing *Franklin v. Lynaugh* (1988), 487 U.S. 164, 174, 108 S.Ct. 2320, 101 L.Ed.2d 155 (in Eighth Amendment jurisprudence, mitigating factors are facts about the defendant's character, background, and record that may call for a penalty less than death). See, e.g., *State v. Leonard,* 104 Ohio

St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 198–199 (evidence of loving, dedicated family, and support of young son entitled to mitigating weight under R.C. 2929.04(B)(7)).

{¶ 90} However, we hold that the trial court's decision not to allow Conway to introduce the photographs into evidence does not require a new sentencing hearing. First, Conway has not shown how he was prejudiced by the trial court's exclusion of this evidence. The photographs themselves, while illustrative of testimony by defense mitigation witnesses, are essentially cumulative of Conway's mitigation evidence. For instance, several witnesses testified that Conway loves and cares for his two young children and enjoys a close relationship with his family. Conway's mitigation witnesses also testified about the photographs in great detail by identifying the individuals depicted, their ages, when and where the photographs were taken, and the activities being pursued.

{¶ 91} Moreover, we can eliminate the effect of the trial court's decision as a result of our independent review. When independently reviewing a sentence of death pursuant to R.C. 2929.05(A), we may consider proffered evidence that the jury was prevented from considering. *State v. Sanders* (2001), 92 Ohio St.3d 245, 267, 750 N.E.2d 90; *State v. Williams* (1996), 74 Ohio St.3d 569, 578, 660 N.E.2d 724. Accordingly, we reject Conway's third proposition.

### B. Penalty–Phase Jury Instructions

{¶ 92} Conway argues in his fifth proposition of law that the trial court gave a faulty reasonable-doubt instruction in the penalty phase by repeating the instruction from the guilt phase. Conway challenges the following instruction: "Reasonable doubt is present when after you've carefully considered and compared all of the evidence you cannot say you are firmly convinced of *the truth of the charge.*" (Emphasis added.) Conway waived this issue by not objecting to the court's instruction. *State v. Franklin* (1991), 62 Ohio St.3d 118, 128, 580 N.E.2d 1; *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus; Crim.R. 30(A).

{¶ 93} We have consistently rejected claims of prejudice stemming from the erroneous use of this particular reasonable-doubt instruction in the penalty phase. See *State v. Jones* (2000), 90 Ohio St.3d 403, 418, 739 N.E.2d 300; *State v. Goff* (1998), 82 Ohio St.3d 123, 131–132, 694 N.E.2d 916; *State v. Taylor* (1997), 78 Ohio St.3d 15, 29–30, 676 N.E.2d 82. We stated in those cases that an appropriate penalty-phase instruction on reasonable doubt conveys to the jurors that they must be firmly convinced that the aggravating circumstances outweigh the mitigating factors and that the prosecution has the burden of proof on the issue.

{¶ 94} In addition to the challenged instruction, the trial court told the jury, "The burden is solely on the State to prove that the aggravated circumstances outweigh the mitigating factors beyond a reasonable doubt." There were three similar instructions informing the jury that, before imposing the death penalty, they must be unanimously convinced beyond a reasonable doubt that the aggravating circumstances in this case outweigh the mitigating factors. Therefore, we hold that the instructions when viewed as a whole were not prejudicial. See, also, *State v. Woodard*, 68 Ohio St.3d at 76–77, 623 N.E.2d 75. Accordingly, we overrule Conway's fifth proposition.

## V. Ineffective Assistance of Counsel

{¶ 95} In his seventh proposition of law, Conway makes various claims relating to ineffective assistance of trial counsel. Reversal of a conviction or sentence based upon ineffective assistance of counsel requires satisfying the two-prong test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. *Strickland* requires that the defendant show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. Id. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In order to show deficient performance, the defendant must prove that counsel's performance fell below an objective level of reasonable representation. To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id.; *State v. Bradley* (1989), 42 Ohio St.3d 136, 143, 538 N.E.2d 373.

### A. Guilt Phase

{¶ 96} *Failure to request hearing.* Immediately prior to Arthurs's testimony, defense counsel complained that the prosecutor had violated the trial court's order for separation of witnesses when Arthurs spent approximately 50 minutes in a holding cell talking with Detective Zachary Scott, one of the investigating detectives in the case. Conway now contends that trial counsel were ineffective in failing to request a hearing on this issue. We disagree.

{¶ 97} There is no evidence that the trial court's separation order was violated. First, Detective Scott was on the list of potential witnesses, but the prosecution never called Scott as a witness. When defense counsel brought the issue to the trial court's attention, the prosecutor explained that Detective Scott was assigned to keep the state's witnesses separated while they were housed in holding cells prior to testifying. The prosecutor had also instructed Scott not to talk about the case, and there is no evidence that he disobeyed this instruction.

{¶ 98} Second, there is no evidence that Detective Scott heard any of the testimony of the prosecution witnesses who testified before Arthurs. In fact,

Conway does not complain that Scott was in the courtroom while these witnesses testified or that he was privy to their testimony.

{¶ 99} Finally, defense counsel cross-examined Arthurs on this issue. Arthurs admitted that he and Scott talked in the holding cell prior to his testimony but denied that they discussed this case. Thus, trial counsel did not perform deficiently by failing to request a hearing.

{¶ 100} *Prejudicial cross-examination.* Conway claims that trial counsel were ineffective when their cross-examination of Trent opened the door to damaging testimony on redirect. On cross-examination, defense counsel attempted to impeach Trent regarding his reasons for contacting the prosecutor about the Dotson murder. Defense counsel inquired into a letter that Trent had written to prosecutors while he and Conway were incarcerated together, and counsel questioned why Trent's letter had failed to mention Conway's role in Dotson's murder. On redirect, the prosecutor was able to elicit that Trent had written the letter at Conway's request in order to be placed into protective custody so that he could kill a witness against Conway in an unrelated case.

{¶ 101} The scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel. *State v. Hoffner,* 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45; *State v. Campbell* (2000), 90 Ohio St.3d 320, 339, 738 N.E.2d 1178. In addition, to fairly assess counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 102} Admittedly, counsel may not have exercised the best judgment in cross-examining Trent on his letter to the prosecutor. (See our discussion regarding Conway's eighth proposition of law.) The details of the letter were previously unknown to the jury because the state did not attempt to question Trent during his direct testimony about the contents of the letter. Nevertheless, even if counsel's cross-examination reflected deficient performance, Conway has failed to establish prejudice under *Strickland.* The jury had before it similar testimony that Conway had hired Trent to kill Arthurs in order to prevent Arthurs from testifying against Conway. Thus, Conway has not shown that there was a reasonable probability that, but for counsel's error, the result of his trial would have been different.

{¶ 103} *Failure to object.* Conway contends that counsel rendered ineffective assistance when they failed to object to inadmissible hearsay and other-acts testimony. However, the failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel. *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831; *State v. Gumm* (1995), 73 Ohio St.3d 413, 428, 653 N.E.2d 253.

{¶ 104} First, Conway claims that trial counsel should have objected to hearsay testimony from Roberta Hannah that Dotson had made a phone call to her from Chillicothe, "where * * * events leading up to the homicide began." Conway's claim is without merit.

{¶ 105} Hearsay is an out-of-court statement made by the declarant offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). Hannah's testimony was not objectionable on hearsay grounds, because she never testified that Dotson had made the statement in question—i.e., that he was calling from Chillicothe. See Evid.R. 801(B) (defining "declarant" as "a person who makes a statement"). While the statement was objectionable under Evid.R. 602 based on Hannah's lack of personal knowledge, Conway has not shown that counsel's failure to object affected the outcome of the trial. Indeed, Conway concedes in his brief that other evidence indicated that Dotson was in Chillicothe just prior to his death.

{¶ 106} Second, Conway claims that defense counsel were ineffective by eliciting hearsay testimony from Arthurs on cross-examination that Nightingale had told Arthurs that Conway had shot Jesse James. Conway claims that counsel should have asked the court to strike Arthurs's response.

{¶ 107} The state argues that Nightingale's statement was not hearsay, because it was admissible as a statement by a co-conspirator under Evid.R. 801(D)(2)(e). To be admissible as a nonhearsay statement, Evid.R. 801(D)(2)(e) requires that the co-conspirator's statement must be made during the course of the conspiracy. While the record is not entirely clear, it appears that Nightingale's statement to Arthurs was made prior to the commencement of the conspiracy to kill Dotson. Thus, we reject the state's co-conspirator argument.

{¶ 108} Nevertheless, even if we determine that defense counsel should have moved to strike this testimony, Conway has failed to show that a reasonable probability exists that the outcome of his trial would have been different had counsel done so. Other evidence proved that Conway shot Jesse James.

{¶ 109} Third, Conway claims that his trial counsel were ineffective for not objecting to Hannah's testimony describing the incident during which Conway had yelled at Dotson. However, we decided under Conway's eighth proposition of law that Hannah's testimony was properly admitted. Thus, there was no basis for counsel to object.

{¶ 110} *Failure to request curative instructions.* Conway contends that, in addition to not objecting to inadmissible hearsay and other-acts evidence, trial counsel rendered ineffective assistance by failing to request curative instructions regarding this evidence. Conway maintains that whenever clearly inadmissible evidence is presented to the jury, counsel has a "clear obligation" to request a curative instruction.

{¶ 111} However, counsel's decision not to request a jury instruction falls within the ambit of trial strategy. See, e.g., *State v. Lawson* (1992), 64 Ohio St.3d 336, 341, 595 N.E.2d 902; *State v. Schaim* (1992), 65 Ohio St.3d 51, 61, 600 N.E.2d 661, fn. 9. Furthermore, debatable trial tactics do not constitute ineffective assistance of trial counsel. *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 402 N.E.2d 1189; *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 146. Conway does not mention what language the curative instructions should have contained or how such instructions would have cured any errors. As Conway has failed to show that counsel's decision not to request curative instructions was either unreasonable trial strategy or prejudicial, we reject his claim. Cf. *State v. Davie* (1997), 80 Ohio St.3d 311, 331, 686 N.E.2d 245 (counsel's decision not to request curative instructions to inadmissible evidence reflected an objective standard of reasonable representation).

{¶ 112} *Testimony of Jesse James.* Conway contends that trial counsel were ineffective because they called Jesse James as a defense witness. Conway claims that James's testimony established that Conway murdered Dotson to escape detection for committing a felonious assault on James. See R.C. 2929.04(A)(3).

{¶ 113} Counsel's decision to call a witness is a matter of trial strategy. Such decisions will generally not be second-guessed by a reviewing court. *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 143; *State v. Treesh*, 90 Ohio St.3d at 490, 739 N.E.2d 749. We conclude that counsel's decision to call James as a defense witness did not amount to ineffective assistance of counsel.

{¶ 114} As a defense witness, James testified that he was shot on September 14, 2001. He claimed that Dotson was at the scene but that he was unable to identify his shooter. On cross-examination, James did testify that a "big, fat white guy" with a gun was at the scene. While Conway resembled this description, James never testified that Conway was present at the shooting. In addition, James said that the shooting occurred in a residential neighborhood and that no White Castle restaurant was located nearby, testimony that contradicted the testimony of Trent, who had said that Conway shot someone at White Castle. Finally, James testified that, to his knowledge, no charges had been filed regarding his shooting.

{¶ 115} Defense counsel noted for the record that they made a strategic decision to call James as a witness in light of the trial court's ruling denying the defense's Crim.R. 29 motion. Moreover, counsel's decision to call James reflected reasonable trial strategy. James's testimony could have created reasonable doubt in the minds of jurors regarding whether Conway had shot James. That this strategy was unsuccessful and the jury ultimately found Conway guilty of the R.C. 2929.04(A)(3) specification is not a basis for finding ineffective assistance of

counsel. Trial counsel's strategic choices must be accorded deference and cannot be examined through the distorting effect of hindsight. *Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Cook* (1992), 65 Ohio St.3d 516, 524–525, 605 N.E.2d 70.

## B. Penalty Phase

{¶ 116} *Failure to object to reasonable-doubt instruction.* Conway maintains that his trial counsel were ineffective for not objecting to the trial court's penalty-phase reasonable-doubt instruction. But this instruction was harmless. (See the discussion regarding Conway's fifth proposition of law.) Thus, we cannot deem counsel ineffective for failing to object.

{¶ 117} *Failure to call psychologist.* Conway argues that his trial counsel were ineffective for failing to call a psychologist during the penalty phase. Trial counsel did employ the services of Dr. Robert Stinson, a forensic psychologist, but did not call Dr. Stinson as a defense mitigation witness.

{¶ 118} A decision by trial counsel not to call an expert witness generally will not sustain a claim of ineffective assistance of counsel. *State v. Coleman* (1989), 45 Ohio St.3d 298, 307–308, 544 N.E.2d 622; *State v. Thompson* (1987), 33 Ohio St.3d 1, 10–11, 514 N.E.2d 407. The record does not reveal why Dr. Stinson was not called to testify or what testimony he would have provided. Thus, nothing in the record establishes that counsel were deficient by not calling Dr. Stinson or that, if called, he would have provided relevant mitigating evidence. Therefore, we hold that this claim has no merit. See, e.g., *State v. Goodwin* (1999), 84 Ohio St.3d 331, 335, 703 N.E.2d 1251.

{¶ 119} *Testimony of high school physics teacher.* Finally, Conway claims that his trial counsel were ineffective in calling William Kruczynski, his high school physics teacher, as a mitigation witness. Kruczynski testified that Conway was a very good physics student but, notwithstanding, he believed that Conway was an "at-risk" student. Kruczynski defined an at-risk student as one who may have "problems in * * * life, at home or work or somewhere else" that may prevent the student from performing up to his or her capabilities in class. Conway contends that Kruczynski's testimony left the jury with the impression that Conway "most certainly had the potential to do something positive with his life, and that he most certainly understood the consequences of the decisions he was making."

{¶ 120} Kruczynski's testimony corroborated other mitigation testimony and fit within the overall mitigation strategy adopted by the defense: to show that Conway was physically and verbally abused by his father and that Conway has some redeeming qualities. Thus, Conway has not shown that his counsel were deficient in calling Kruczynski or that there was a reasonable probability that the

outcome of his penalty hearing would have been different had Kruczynski not testified.

{¶ 121} Based on the foregoing, we conclude that Conway has not shown that he was deprived of the effective assistance of trial counsel. Accordingly, we reject Conway's seventh proposition of law.

## VI. Constitutional Issues

{¶ 122} In his first proposition of law, Conway raises various constitutional challenges to Ohio death-penalty statutes. However, we have already rejected similar arguments. See, e.g., *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; *State v. Carter* (2000), 89 Ohio St.3d 593, 734 N.E.2d 345. Ohio's capital sentencing scheme is constitutional. See, e.g., *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009; *State v. Smith* (1997) 80 Ohio St.3d 89, 684 N.E.2d 668; *State v. Evans* (1992), 63 Ohio St.3d 231, 253–254, 586 N.E.2d 1042. Accordingly, we summarily reject Conway's first proposition of law. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568.

## VII. Independent Sentence Evaluation

### A. Penalty Hearing

{¶ 123} At the penalty hearing, Conway called 12 mitigation witnesses and gave an unsworn statement.

{¶ 124} Tina Bourne, Conway's cousin, is the same age as Conway, and they grew up together. Bourne said that Conway is like a brother, and she wants him to remain in her life.

{¶ 125} Conway has two children: four-year-old James IV, whose nickname is "Bubba," and two-year-old Halle. According to Bourne, Conway is very close to his children.

{¶ 126} Bourne described Conway's father, James Conway Jr., as an "extremist." Bourne said that Conway's father loved his children, but he would get upset over "the littlest things" and would physically and verbally abuse Conway and his siblings.

{¶ 127} Conway's uncle, Richard Wilkinson (the brother of Conway's mother, Janice Conway), said that Conway's father was "volatile" and violent at times. According to Richard, Conway's father gave Janice Conway a "black eye or two." Conway's father was not a good role model, and he failed to provide Conway with basic values or a strong work ethic.

{¶ 128} Richard also noted that Conway was intelligent and performed well in school. Conway was an elementary school chess champion and was good at

sports. Richard said that Conway would be a good influence on his children even while incarcerated.

{¶ 129} Thelma Jean Wilkinson, Conway's maternal grandmother, testified that Conway lived with her while his father was in prison and that she loved Conway.

{¶ 130} Randall Wilkinson, Conway's uncle, testified that his daughter, Tina Bourne, and Conway attended Bible school together. Conway also played football for the west side Boys' Club and was in high school ROTC. He wanted to become a Navy SEAL but was rejected because of poor eyesight. Randall said that Conway adds "value" to his life and that he will maintain contact with Conway if Conway is given a life sentence.

{¶ 131} John Hambel, Conway's uncle, has lived in close proximity to Conway his entire life. Conway's father used to "whip" his children, but John never discussed this matter with Conway's father or considered calling children's services or the police. John and Conway are close in age; they played youth football together for the west side Boys' Club, and later, both coached football at the boys' club. John has maintained his close relationship with Conway during his incarceration.

{¶ 132} Maranda Oliver, the mother of Conway's daughter, Halle, had a one-year relationship with Conway. While they were dating, Conway attended Columbus State and made the dean's list. Oliver still maintains contact with Conway, and she believes it is important that Conway remain in Halle's life.

{¶ 133} Jo Ellen Conway, Conway's aunt, baby-sat Conway when he was a child. Her relationship with Conway is important, and she wants to continue to be a part of his life.

{¶ 134} Jo Ellen testified that her brother, Conway's father, physically abused her as well as his wife, Janice. She described her brother as a "maniac" and said that he verbally abused his children.

{¶ 135} Gretchen Roese met Conway through his sister and had a several-month romantic relationship with him. Roese remains friends with Conway, visits him in jail, writes letters, and talks with him on the phone. Roese said that Conway has a great relationship with his children.

{¶ 136} Roese, however, observed that Conway's relationship with his father is abnormal. Roese claims that Conway's father constantly yelled, called Conway names, and never offered any positive comments.

{¶ 137} William Kruczynski, Conway's high school physics teacher, testified that Conway was a very good physics student. However, he opined that Conway was an "at-risk" student, which he described as a student who has problems outside of school that prevents the student from performing to his or her full potential in class.

{¶ 138} Clara Hambel, Conway's paternal grandmother, described her family as very close. Clara has spent a considerable amount of time with Conway, and continues to write and visit him in jail. Clara said Conway's children also visit him in jail and that he is a loving and supportive father. Everyone in the family loves Conway and wants him to remain a part of their lives.

{¶ 139} Jennifer Conway, Conway's sister, enjoys a close relationship with Conway and said that the entire family is tight-knit. Jennifer helps care for Conway's children while he is incarcerated. She still loves her brother, visits him in jail every chance she gets, and will always support him.

{¶ 140} Jennifer said that Conway did well in school and was always on the honor roll when he was younger. In high school, Conway was in the band and ROTC.

{¶ 141} Jennifer described her father as very stern. He would become angry over little things and yell a lot and was always critical. Her father would often "whoop" her and her brothers, and he was verbally abusive.

{¶ 142} Janice Conway, Conway's mother, said that her husband was incarcerated after Conway was born and that she took Conway to visit him in prison. Her husband drank a lot and physically abused her and the children, once breaking their other son's jaw. However, Janice never thought of calling the police or children's services because she did not think it would help. In hindsight, Janice recognized that she should have left and taken the children with her.

{¶ 143} Janice testified that Conway did well in school and played chess, football, and the saxophone. Conway was in high school ROTC and wanted to be a Navy aviator and a Navy SEAL. However, his eyesight was poor, and he did not pass the tests. Janice visits Conway in jail and wants to maintain their relationship.

{¶ 144} In Conway's unsworn statement, he said he could never imagine what Dotson's family was going through. Conway asked the jury for the opportunity to see his children grow older and to teach them right from wrong. He said that no one can do that better than people who "had opportunities and made the wrong choices in their life."

{¶ 145} Conway said that he would like to be there for his family, and he never realized until then how many people cared for him. Ultimately, he said that his family was being punished for the "things that [he has] been convicted of." Conway hoped that the jurors could see that his family did nothing wrong and that they would spare his life.

## B. Sentence Evaluation

{¶ 146} The jury convicted Conway of three death-penalty specifications: R.C. 2929.04(A)(3), aggravated murder to escape detection, apprehension, trial or punishment for another offense; R.C. 2929.04(A)(7), aggravated murder during a kidnapping; and R.C. 2929.04(A)(8), aggravated murder to prevent the victim from testifying in a criminal proceeding. For purposes of sentencing, the trial court merged the R.C. 2929.04(A)(3) and (A)(8) specifications and submitted two aggravating circumstances for the jury's consideration. See *State v. Frazier* (1995), 73 Ohio St.3d 323, 344, 652 N.E.2d 1000.

{¶ 147} After independent assessment, we hold that the evidence establishes beyond a reasonable doubt that Conway killed Andrew Dotson during a kidnapping and that he did so for the purpose of escaping detection for committing a felonious assault. Conway solicited Arthurs and Nightingale to kill Dotson because Dotson had seen Conway shoot Jesse James. Arthurs and Nightingale drove Dotson to West Virginia under false pretenses for the purpose of killing him. When they could not carry out the murder, Conway ordered them to bring Dotson to him, and Conway killed Dotson himself.

{¶ 148} Nothing in the nature and circumstances of the offense is mitigating. Dotson was passed out from ingesting drugs when Conway instructed Arthurs and Nightingale to follow him to a nearby cornfield. After arriving at the cornfield, Conway brutally killed Dotson by striking him twice in the chest with a pickax as he lay unconscious and helpless on the ground.

{¶ 149} Conway's history, character, and background provide some mitigating features. There was testimony that Conway's father verbally and physically abused Conway and other family members. Despite this abuse, Conway was able to succeed in several areas. Witnesses attested to Conway's academic achievements in grade school, high school, and college. As a juvenile and young adult, Conway was successful in several endeavors, including chess, football, band, and high school ROTC.

{¶ 150} Several family members and friends testified that Conway is a loving and supportive father to his two young children. While attending college, Conway was employed at his uncle's concrete company, and he contributed to his local community by coaching youth football. We accord some mitigating weight to these factors. See, e.g., *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 198; *State v. Fox* (1994), 69 Ohio St.3d 183, 194, 631 N.E.2d 124.

{¶ 151} Conway's age of 23 at the time of the offense qualifies as a mitigating factor under R.C. 2929.04(B)(4) (youth of offender). However, we assign only modest weight to this factor. See, e.g., *State v. Fears* (1999), 86 Ohio St.3d 329,

349, 715 N.E.2d 136; *State v. Dunlap* (1995), 73 Ohio St.3d 308, 319, 652 N.E.2d 988.

{¶ 152} As to the R.C. 2929.04(B)(7) "other factors," Conway grew up in a loving, supportive, and close-knit family. Several family members and friends testified of their love for Conway and the importance of having him in their lives. We have also considered Conway's family photographs that the trial court improperly excluded. The love and devotion of Conway's family and friends qualify as "other factors" worth some mitigating weight. See, e.g., *State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 199; *State v. Jalowiec* (2001), 91 Ohio St.3d 220, 239, 744 N.E.2d 163. That Conway has children who love and need him is also mitigating. See, e.g., *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, at ¶ 144. There was some brief testimony that Conway would do well in a structured and disciplined environment, but this factor is entitled to only slight weight.

{¶ 153} We hold that Conway's unsworn statement is entitled to little weight. Conway expressed little remorse and never specifically apologized for murdering Dotson. See, e.g., *State v. Gapen,* 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, at ¶ 180; *State v. Keene,* 81 Ohio St.3d at 671, 693 N.E.2d 246.

{¶ 154} As to the remaining statutory mitigating factors, no evidence was presented in regard to R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(5) (lack of a significant criminal record), and (B)(6) (accomplice only).

{¶ 155} Upon weighing the evidence, we hold that the aggravating circumstances of murder to escape detection, R.C. 2929.04(A)(3), and murder in the course of a kidnapping, R.C. 2929.04(A)(7), outweigh Conway's collective mitigation evidence beyond a reasonable doubt. Therefore, we hold that Conway's death sentence is appropriate.

{¶ 156} Finally, the death penalty imposed is proportionate to death sentences approved in other cases in which the R.C. 2929.04(A)(3) specification was present in combination with an R.C. 2929.04(A)(7) specification. See *State v. Brinkley,* 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 180; *State v. Noling,* 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 152; *State v. Frazier,* 73 Ohio St.3d at 344–345, 652 N.E.2d 1000.

{¶ 157} Accordingly, we affirm the convictions and sentences, including the sentence of death.

Judgment affirmed.

MOYER, C.J., PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

Ron O'Brien, Franklin County Prosecuting Attorney, and Steven L. Taylor, Sheryl L. Pritchard, and Jennifer L. Coriell, Assistant Prosecuting Attorneys, for appellee.

W. Joseph Edwards and Dianne Worthington, for appellant.