[Cite as *State v. Eddy*, 2017-Ohio-741.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 104417

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## TERRELL S. EDDY

DEFENDANT-APPELLANT

### JUDGMENT:
AFFIRMED AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-602449-A

**BEFORE:** Boyle, J., Kilbane, P.J., and McCormack, J.

**RELEASED AND JOURNALIZED:** March 2, 2017

**ATTORNEY FOR APPELLANT**

James R. Willis
614 West Superior Avenue
1144 Rockefeller Building
Cleveland, Ohio   44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
BY:    Nathalie E. Naso
Assistant County Prosecutor
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, J.:

**{¶1}** Defendant-appellant, Terrell Eddy, appeals his convictions. He raises four assignments of error for our review:

1. The court erred when it denied the motions for judgment of acquittal made at the end of the state's case, which were renewed at the close of all evidence.

2. The court erred when it admitted as substantive proof evidence that showed (despite the lack of any relevance), that inside the vehicle Eddy was apprehended in and arrested (after being therein for a very short while) the police found a weapon and a use quantity of marijuana.

3. Given the criminal charges made herein were based on conduct that occurred elsewhere and related to the use of a gun and narcotics, the admission of a different gun and a use quantity of drugs, found in the car, in which the accused was a mere passenger, and which added nothing of evidentiary worth in relation to his various charges cannot possibly be deemed harmless.

4. The court erred when it denied appellant's motion for mistrial.

**{¶2}** Finding no merit to his arguments on appeal, we affirm. We remand, however, for nunc pro tunc correction of the sentencing entry as further explained at the end of this opinion.

## I. Procedural History and Factual Background

**{¶3}** In January 2016, Eddy was indicted on seven counts: second-degree felonious assault in violation of R.C. 2903.11(A)(2); third-degree discharge of a firearm on or near prohibited places in violation of R.C. 2923.162(A)(3); fourth-degree trafficking (between five and ten grams of cocaine) in violation of R.C. 2925.03(A)(2); fifth-degree trafficking (less than 200 grams of marijuana) in violation of R.C.

2925.03(A)(2); fourth-degree drug possession (between five and ten grams of cocaine) in violation of R.C. 2925.11(A); minor misdemeanor drug possession (less than 100 grams of marijuana); and possessing criminal tools in violation of R.C. 2923.24(A). The charges carried several specifications attached to them, including one- and three-year firearm specifications, and various forfeiture of property specifications (weapons and drug-related items). Eddy pleaded not guilty to all charges, and the case proceeded to a jury trial where the following evidence was presented.

{¶4} On July 31, 2015, Cleveland police responded to a call around 5:00 p.m. of shots being fired at an apartment complex on Livingston Road. Officer Chris Lane arrived on the scene first. He explained that when he pulled into the parking lot of the apartment complex, there was a green Ford Explorer parked in a parking space. The Explorer was running, and its driver's-side door was open, but no one was in it.

{¶5} Officer Lane and his partner "processed the scene." Officer Lane found a couple of bullet holes in the green Explorer, including one on the driver's side of the vehicle, one on the passenger door, and one on the back window. The vehicle also had a flat tire. Officer Lane found a bag of marijuana on the passenger seat, a bag of cocaine in the center console cup holder, and a scale in the center console. He also found Eddy's identification in the vehicle and several shell casings on the ground near the driver's side of the car.

{¶6} Officer Lane said that a female approached him and told him what she had seen. He broadcasted a description of the males that the woman gave to him.

**{¶7}** Sergeant Patrick Petranek and Detective Robert McKay testified that they also responded to a call of shots being fired on Livingston Road. They explained that when they arrived at the apartment complex, a zone police car was already pulling into the parking lot so they searched the surrounding areas. The radio call had said that a male with "dreads" had fled south, possibly on a bicycle and possibly with a gun; another male in a white T-shirt had fled north, through the parking lot. While they were patrolling the area, a female flagged them down and told them that a male, who was wearing a white T-shirt and carrying a gun in hand, had just "jumped" into a gold SUV. The female pointed to where the gold SUV was.

**{¶8}** Sergeant Petranek and Detective McKay followed the gold SUV for several minutes, until other police vehicles arrived to assist. Sergeant Petranek approached the front passenger door where Eddy was seated. Eddy immediately told Sergeant Petranek, "don't shoot me, there's a gun in my lap." Sergeant Petranek retrieved the gun, a 9 mm handgun, and secured it. He then took Eddy out of the vehicle and handcuffed him.

**{¶9}** Detective McKay said that he approached the driver's side of the gold SUV. He could smell a strong odor of marijuana emanating from the vehicle. Detective McKay removed the driver, Deandre Johnson, from the car and placed him in handcuffs.

**{¶10}** Police found a second gun in a hidden compartment under the front passenger seat of the gold SUV. Although Eddy initially tried to claim the second gun as his to protect his friend, the gun actually belonged to Johnson. Police also found a

box of sandwich "baggies" in the back seat of the gold SUV, marijuana in the center console, and a digital scale below the marijuana.

{¶11} Detective McKay, who was the primary investigating officer, interviewed Eddy when he was removed from the gold SUV. Eddy informed Detective McKay that he had a license to carry a concealed weapon. Eddy said that he went to the apartment complex on Livingston Road to purchase marijuana from a man who ended up robbing him. Eddy further told Detective McKay that when the man started shooting, Eddy fled and left his vehicle running in the parking lot.

{¶12} Police took Eddy back to the apartment complex. Detective McKay stated that at this point, Eddy was claiming that he was a victim and they were treating him as such. Detective McKay spoke to the officers who were already at the scene, as well as the apartment complex security guard and numerous witnesses. Detective McKay said that after speaking with the officers who were on the scene, he "got a different story" than Eddy had originally told him. At that point, Eddy became a suspect, so Detective McKay read Eddy his rights and interviewed him a second time.

{¶13} Eddy told Detective McKay that he was going to purchase marijuana from an unknown male who Eddy found through a friend. Eddy's friend gave the "seller" Eddy's number. The "seller" called Eddy to arrange the deal at the apartment complex using a private number. Eddy said that the "seller" had told him to park in a certain place, but Eddy parked in another spot and backed in so that he could be "on full alert."

**{¶14}** Eddy told Detective McKay that when the "seller" got into Eddy's vehicle, Eddy began to get his money out and "that is when [the 'seller'] proceeded to pull a gun on [Eddy]." Eddy responded by reaching for his own gun. At that point, the "seller" got out of Eddy's vehicle. When the "seller" began running away from Eddy's vehicle, the "seller" fired his gun at Eddy. Eddy shot back. Eddy said that he was scared because he was not sure if the "seller" had other people with him. Eddy left everything and ran.

**{¶15}** Eddy explained to Detective McKay that in the commotion the "seller" had left the other drugs and the digital scale in Eddy's vehicle. Eddy said that the "seller" took his money; Eddy claimed that he had $30 or $40 in his visor.

**{¶16}** Detective McKay testified that when he interviewed Eddy a second and third time, Eddy kept changing his story. For example, Eddy later told Detective McKay that he had deleted the "seller's" phone number from his phone rather than that the "seller" had contacted him on a private number.

**{¶17}** After reviewing the security cameras of the parking lot, Detective McKay found a spent shell casing from a .380 caliber handgun in an area of the parking lot where they saw the "seller" drop something as he was running away from Eddy's vehicle. Police never found the .380 firearm that was used, nor did they ever learn who the unknown male, the "seller" according to Eddy, was.

**{¶18}** Detective McKay explained that the security guard at the apartment complex was not able to give police a hard copy of the security footage of the parking lot. So the

recording that was played in court was footage from Detective McKay's body camera, which recorded the footage as Detective McKay watched it.

{¶19} As the state played the recording in court, it would stop and ask Detective McKay to explain what was happening on the recording.

{¶20} In the security footage, Eddy's Ford Explorer can be seen backing into a parking space at the apartment complex. Soon after Eddy came to a stop, a man with long hair, wearing jeans and a white T-shirt, appears in the video, walking toward the passenger side of Eddy's car. It does not appear that the man has anything in his hands. Right before the man opens the front passenger door, he appears to pull up his jeans using both hands. Approximately one minute and 40 seconds later (according to the time on the video), the man with long hair got out of Eddy's vehicle. Detective McKay testified that when the man got out of Eddy's car, the video shows that he had a small white bag in his hand. As the man walked away from Eddy's vehicle, he looked back toward the vehicle several times.

{¶21} Approximately eight to ten seconds after the unknown man got out of Eddy's vehicle, Eddy got out of his car and appears to shoot a gun over the top of his car in the direction of where the man had just walked (although the man can no longer be seen in the footage). Eddy then ducked down, looked up, and appears to fire a gun a second time. Although it appears that Eddy shot his gun two times (because he held his arm and hand in that position), it is not clear from the video how many shots Eddy fired

because there is no sound.   At that point, Eddy ran from his vehicle and out of view of the security camera.

{¶22} Detective McKay then viewed a video recording of another angle of the parking lot, which showed where the man with the long hair ran to when he could no longer be seen in the previous recording.   Detective McKay stated that when the man appears, he and Eddy are shooting back and forth.   It does appear as if the man is running backwards, facing Eddy's vehicle, and running sideways as if he is trying to get away from something.   It also appears that right before the man takes off running across the parking lot, he briefly put his arm up, as if he was shooting a gun.   When the man was running across the parking lot, he tripped and almost fell down.   Detective McKay testified that spot was where the man dropped the small plastic bag of marijuana. Detective McKay further stated that this was the same bag of marijuana that was on Eddy's seat when police arrived because a witness at the scene picked it up and placed it on Eddy's passenger seat.

{¶23} Detective McKay stated that Eddy did not have any money on him when he was arrested, nor was there any money found in the green Explorer.

{¶24} At the close of the state's case, Eddy moved for a Crim.R. 29 acquittal. The trial court granted it with respect to discharging a firearm on or near prohibited places.   The trial court denied it with respect to the remaining charges.

{¶25} Eddy testified that he pulled into a gas station and saw his friend JJ.   He asked JJ if he had any marijuana that he could purchase.   JJ did not have any, but said

that he had a friend who could sell Eddy some. JJ gave Eddy's number to the "seller." Approximately 15 minutes later, the "seller" called Eddy on a private number. The "seller" told Eddy to meet him at the apartment complex on Livingston Road. Eddy said that he did not park where the "seller" told him to park because he would have been closed in and not able to easily escape, which made him suspicious because he had never met the "seller" before that day. Eddy parked somewhere else, and backed into the spot so that he could see better.

{¶26} Eddy said that the "seller" got in his vehicle and said, "what's up? Your name Terrell?" The "seller" said, "I'm JJ's friend." Eddy asked him for the marijuana. Eddy told the "seller" that he was wanted the marijuana because he was going to "smoke with some females." The "seller" showed Eddy the marijuana. The "seller" also showed Eddy some cocaine, and asked Eddy if the females "do coke?" Eddy replied that he just wanted to buy the marijuana. Eddy pulled out his wallet, which he said had "maybe close to $400" in it. Eddy opened his wallet and began sorting through it, and then the unknown male "pulled a gun" on Eddy and said, "give me everything." The "seller" took Eddy's money and got out of the car.

{¶27} Eddy testified that he grabbed his gun, opened his car door, and yelled for the "seller" to give him his money back. Eddy said that he told the "seller," "Hey mother f***cker, give me my money back. I have my gun. I have the drop on you. Give me my money back." At that point, the "seller" turned around and "opened fire at

the vehicle." Eddy testified that he shot back at the "seller," firing five or six shots. After he and the "seller" "exchanged fire," Eddy grabbed his cell phone and ran.

{¶28} Eddy said that he called his friend, Deandre Johnson, and told him that he had just been robbed. He asked Johnson to pick him up because Johnson lived near that area. He was going to have Johnson take him home, but that is when the police stopped them.

{¶29} Eddy said that he lied to police that the gun in Johnson's vehicle was his because he did not want to get his friend in trouble because Johnson had tried to help him.

{¶30} Eddy further stated that the scale, marijuana, and cocaine found in his Explorer was placed there by the "seller."

{¶31} Eddy admitted that when he got out of his vehicle and yelled at the "seller" in the parking lot, the seller had not yet shot at him. He agreed that his tire was not flat at that point and that he could have just driven away from the scene. Eddy also admitted that when he told the "seller" that he "had a drop on him," that he meant "I have the upper hand." He further explained that what he meant by that phrase, "I have a drop on you," was that he was warning the "seller" that he had a gun and was in the better position.

{¶32} At the close of all of the evidence, the jury found Eddy guilty of all of the charges. Before sentencing Eddy, the trial court merged the one- and three-year firearm specifications, and merged Counts 3 and 4 (trafficking and possession of cocaine), and Counts 5 and 6 (trafficking and possession of marijuana). The state elected to proceed on the trafficking counts. The trial court sentenced Eddy to three years for the firearm

specification and ordered it to be served prior to and consecutive to two years on the base charge of felonious assault, for a total of five years in prison. The trial court also sentenced Eddy to one year for trafficking cocaine, one year for trafficking marijuana, and one year for possessing criminal tools, and ordered that they all be served concurrent to each other and to the term imposed for felonious assault. The trial court also suspended Eddy's driver's license for six months, until October 25, 2016, ordered forfeiture of the weapon, and imposed three years of mandatory postrelease control.[1] It is from this judgment that Eddy appeals.

## II. Sufficiency of the Evidence

{¶33} In his first assignment of error, Eddy argues that the state failed to present sufficient evidence to convict him beyond a reasonable doubt.

{¶34} "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), citing *Black's Law Dictionary* 1433 (6th Ed.1990). When an appellate court reviews a record upon a sufficiency challenge, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

---

[1]The sentencing entry does not properly reflect what the trial court ordered at the sentencing hearing with respect to forfeiture and postrelease control, which we discuss at the end of this opinion.

proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶35} In this assignment of error, Eddy fails to cite to parts of the record that he is relying on and fails to set forth any law in support of his argument as required by App.R. 16(A)(7).[2] Pursuant to App.R. 12(A)(1)(b), this court is only required to determine the merits of the assignments of error set forth in the briefs in accordance with App.R. 16. Thus, we may dismiss alleged errors that are not presented or argued properly. App.R. 12(A)(2). Nonetheless, we will briefly address Eddy's arguments.

{¶36} Eddy first argues that the state failed to present sufficient evidence that he committed felonious assault. We disagree. In order to prove that Eddy committed felonious assault under R.C. 2903.11(A)(2), the state had to present evidence that showed beyond a reasonable doubt that Eddy knowingly caused or attempted to cause physical harm to another by means of a deadly weapon. According to the video presented at trial, Eddy can be seen getting out of his vehicle, quickly putting his arm over his car, and pointing what appears to be a gun in the direction of the unknown male. Although a gun cannot clearly be seen in Eddy's hand because the video is slightly blurry, the video is strong circumstantial evidence that Eddy had a gun in his hand and fired it toward the unknown male. After firing the first shot, Eddy then quickly pulled his arm back down,

---

[2]Because Eddy does not set forth any law in this assignment of error, the state responds as if Eddy was challenging the weight of the evidence. We disagree based on Eddy's stated assigned error — that the trial court erred when it denied his motion for judgment of acquittal — which addresses sufficiency of the evidence, not the weight of the evidence.

and ducked down. A second or two later, Eddy got up again and appeared to shoot toward the male a second time. Further, it is clear from the video that Eddy and the unknown male were shooting at each other. This evidence is sufficient evidence that Eddy caused or attempted to cause harm to another by means of a deadly weapon.

{¶37} To the extent that Eddy argues he acted in self-defense, self-defense is an affirmative defense a defendant must prove by a preponderance of the evidence. *State v. Smith*, 12th Dist. Warren No. CA2010-05-047, 2011-Ohio- 1476, ¶ 33. Thus, whether Eddy established that he acted in self-defense does not change the fact that the state presented sufficient evidence on each element of felonious assault such that the jury could find him guilty beyond a reasonable doubt.

{¶38} Eddy further argues that the evidence showed that witnesses who called 911 reported that the man with dreadlocks fired first, which goes to Eddy's self-defense claim. But despite Eddy's attempt at trial to get Detective McKay to admit this fact on cross-examination, he failed to do so. When Eddy showed Detective McKay an exhibit marked defense exhibit B, which he purportedly claimed established that 911 callers identified the man with dreadlocks as the one who shot first, Detective McKay refused to agree with Eddy that the notations on the exhibit stood for what he claimed. Detective McKay did agree that one line of the report stated that "the male in white dreads got out of the vehicle and was shooting at the green Ford Explorer and * * * the passenger got out and was shooting back," but Detective McKay would not agree that this one line established anything.

**{¶39}** Defense exhibit B was not entered into evidence, but when shown the exhibit, Detective McKay described it as a "narrative from dispatch, their notes taken from callers," but that "[i]t doesn't depict the entire phone conversation." Detective McKay further stated that the document was only part of an "RMS report," and it was impossible to tell from the document if it was one call or "bits and pieces of different ones." Thus, the only "evidence" at trial that suggested the man with dreadlocks fired first were the questions posed by defense counsel. "A defense attorney's questions are not proof that an event occurred. [S]tatements of counsel are not evidence." *State v. Green*, 81 Ohio St.3d 100, 104, 689 N.E.2d 556 (1998). Moreover, the state admitted a 911 call into evidence. On that call, the caller did not state that the man with dreadlocks fired first.

**{¶40}** Eddy also claims that Sergeant Petranek admitted that police had "no idea who fired the first shot." Eddy's assertion that this statement somehow represented what police knew after investigating the events, however, is disingenuous. When Sergeant Petranek testified to that statement on cross-examination, he was actually disagreeing with defense counsel that police learned through "broadcasts that the guy who fired the first shot was the guy * * * with the dreads."

**{¶41}** Eddy further argues that because there was a witness who picked up a small bag of marijuana from the ground that the unknown male dropped when he was running and placed it in Eddy's car, that it was also possible that the unknown male dropped both the marijuana and the cocaine on the ground, and the witness then placed both drugs in

his vehicle. Eddy argued this at trial, however, and the jury was free to disregard it; jurors are free to believe all, part, or none of the testimony presented at trial.

{¶42} After review, we find that the state presented sufficient evidence, if believed, such that the jury could find Eddy guilty beyond a reasonable doubt. Accordingly, we overrule Eddy's first assignment of error.

## III. Relevant Evidence

{¶43} In his second and third assignments of error, Eddy argues that the trial court erred when it allowed the state to present evidence of a gun, drugs, and drug-related items (a scale and small "baggies") that were found in the gold SUV that belonged to his friend, the driver of the gold SUV, who picked him up when he was running from the apartment complex. Eddy contends that the state presented this evidence as substantive proof that he committed the offenses. We disagree.

{¶44} Evidence that is admitted over an appellant's objection at trial is subject to an abuse of discretion standard. A trial court has broad discretion in determining whether to admit or exclude evidence. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 62. Absent an abuse of discretion and a showing that the accused has suffered material prejudice, an appellate court will not disturb the ruling of the trial court as to the admissibility of relevant evidence. *Id*. An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Id*.

**{¶45}** All relevant evidence is admissible, except as otherwise provided by federal and state law. Evid.R. 402. Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. But relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Further, relevant evidence "may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B).

**{¶46}** In this case, Eddy argued that he was attempting to purchase marijuana from an unknown seller of drugs. Eddy asserted that he did not know this seller and stated that he was nervous about this transaction. He stated that he did not park where the seller originally told him to park because he felt that he would have been "boxed in" and not able to see everything. He parked in a different spot and backed in so that he could easily see what was going on around him and more easily escape if he had to.

**{¶47}** The state presented evidence of what was recovered in the gold SUV to establish that Eddy's good friend — who he called to pick him up after running from the apartment complex — sold drugs. The state offered this evidence to counter Eddy's defense that he presented at trial. The state's theory was that Eddy was selling drugs to the unknown male. The state argued in its closing arguments that if Eddy wanted to purchase marijuana, he could have just called his good friend, Johnson, who lived nearby,

rather than take a risk and purchase it from an unknown seller. The items found in the gold SUV were relevant to counter Eddy's defense; they were not offered as substantive proof of Eddy's guilt.

**{¶48}** We further disagree with Eddy that the probative value of the items found in the gold SUV was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. The evidence that was found in the gold SUV was distinctly separated from the evidence found in Eddy's Explorer. The evidence was not confusing or complex. And the jury was well aware that Johnson pleaded guilty to carrying a concealed weapon and drug trafficking for the items that were found in the gold SUV. Thus, the trial court did not abuse its discretion when it permitted the state to present the evidence of a gun, drugs, and drug-related items that were found in the gold SUV.

**{¶49}** Eddy's second and third assignments of error are overruled.

## IV. Motion for Mistrial

**{¶50}** In his fourth assignment of error, Eddy contends that the trial court erred when it denied his motion for mistrial. Eddy moved for a mistrial because Detective McKay gave "his interpretation of the video" that it was Eddy who shot at the unknown male first. Eddy argued to the court that Detective McKay did not qualify as an expert and, thus, could not render his opinion as to what the video showed. Eddy contended that it was for the jury to determine what the video showed.

**{¶51}** The grant or denial of a motion for mistrial under Crim.R. 33 rests within the sound discretion of the trial court. *State v. Murphy*, 4th Dist. Scioto No. 09CA3311, 2010-Ohio-5031, ¶ 83, citing *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987). "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *In re C.K.*, 2d Dist. Montgomery No. 25728, 2013-Ohio-4513, ¶ 13, citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985).

**{¶52}** "A mistrial should not be ordered in a criminal case merely because some error or irregularity has intervened, unless the substantial rights of the accused or the prosecution are adversely affected; this determination is made at the discretion of the trial court." *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist.1988). The granting of a mistrial is necessary only when a fair trial is no longer possible. *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991), citing *Illinois v. Somerville*, 410 U.S. 458, 462-463, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).

**{¶53}** We agree with Eddy that in this case Detective McKay was not an expert witness when testifying; he was a lay witness. Evid.R. 701 and 704 govern the admissibility of lay opinion testimony and provide respectively:

RULE 701. Opinion Testimony By Lay Witnesses

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue.

RULE 704. Opinion On Ultimate Issue

Testimony in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact.

{¶54} We further agree with Eddy that Detective McKay's opinion as a lay witness regarding the ultimate issue of who shot first was not admissible. Detective McKay did not witness the shooting, nor was his testimony helpful to the jury as the jurors were capable of viewing the video themselves to determine exactly what it did or did not know regarding who shot first. Nonetheless, while Eddy makes a valid argument that Detective McKay should not have given his opinion as to who shot first on the video, it is important to note the sequence of events that occurred at trial.

{¶55} During Detective McKay's direct examination, he never gave his interpretation of the video — specifically, Detective McKay never testified on direct examination that in his opinion the video showed Eddy shooting at the unknown male first. When the state played the portion of the video that showed Eddy getting out of his car and shooting toward the direction of where the unknown male had gone, the state asked Detective McKay, "And what did you observe when you viewed that video?" Eddy objected, and the trial court sustained the objection. After a series of questions relating to what occurred inside the vehicle, the state played the portion of the video again that showed Eddy getting out of his vehicle. The state stopped playing the video at the point where the shooting began and asked Detective McKay, "And what happens immediately after Terrell Eddy gets out of his vehicle?" Detective McKay replied, "He starts —[.]" Eddy objected again, and the trial court sustained Eddy's objection, stating,

"Why can't the jury make their determination by viewing it themselves?"   The state then continued with another line of questioning.

{¶56} On cross-examination, however, the jury heard Detective McKay's opinion that Eddy fired first.   The following exchange took place when defense counsel was questioning Detective McKay about Eddy's version of the events.

> Q. * * * So what you're telling us is it's impossible that the robber was trying to sell something to the defendant and the defendant didn't want to buy and the robber didn't take his money and got out of the car.   That didn't happen [ ] that way.
>
> A.   It makes absolutely no sense that way.
>
> Q. To you.
>
> A. Correct.
>
> * * *
>
> Q. But you can't explain to me how his wallet gets on the seat of that car; how he doesn't have any money to buy, if that's the assumption that you are operating on.
>
> A. I'm not under the assumption that he was buying any marijuana. I'm under the assumption he was selling it.
>
> Q. And didn't sell it.
>
> A. Correct. He got robbed instead.
>
> Q. So you believe he was robbed.
>
> A. Well, I believe it was a theft. I think he weighed out the drugs on a scale, the kid picked up —
>
> THE COURT: Let him finish —

A. The kid looks, by the way, the kid got in, was going to buy the marijuana, he weighed it up, he looked at it, got out of the vehicle and walked away.

Q. Let me — you've been on the police force for 20 years.

A. Correct.

Q. Now, when you take something from another person with a gun, that's not a theft, that's a robbery, isn't it?
A. I don't know.

Q. Yes or no.

A. I don't know — by the looks of the video the gun was not seen until after your defendant started shooting at him.

Q. It was seen before that because —

A. According to who?

Q. — the defendant told you the man stuck a gun in his face and took his property.

A. He also told me the male started shooting at him as he was getting out of the vehicle and the video does not show the male shooting until after the defendant started shooting at him.

Q. But that's your version —

A. That's what the evidence shows.

Q. — of the truth.

A. That's what the evidence shows.

Q. I understand. It just doesn't show that he was shooting at the man the minute he got out of the car. The evidence shows the man was walking away from the car 10, 15 feet when the first shot was fired.

A. That's correct. That's the exact opposite of what the defendant stated happened.

Q. That depends on what interpretation you put on as he was getting out of the car, doesn't it?    That's all right.    You don't have to answer.

A. My interpretation of somebody getting out of the car is not after they have walked 20 feet away with their back towards the individual.

Q. That's your interpretation and you certainly are entitled to it.

A. Correct.

Q. Everybody's entitled to their opinion.

A. His interpretation may be when the guy was walking [a]way that he was shooting at him.

Q. I understand now.

**{¶57}** Defense counsel then goes on to another subject.    Upon redirect-examination, the following exchange occurred:

Q. Now, who do you believe shot first?

[Defense counsel]: Objection.

THE COURT: Overruled.

A. I believe the defendant shot first.

Q. Why do you believe that the defendant shot first?

[Defense counsel]: Objection.

A.  Because by watching the videotape, watching both screens simultaneously as it was taking place, the other male with the braids got out of the vehicle, was walking away looking back.   The defendant got out, appeared to have said something as he was reaching the gun over the vehicle and fired off a round.   At that point the other male stated ducking, pulling the pistol out of his pocket; he turned and started shooting back.

Q. Now, Terrell Eddy before July 13, 2015 was Terrell Eddy known to you in any capacity?

A. Not to my knowledge. No.

Q. Do you have any sort of vendetta or agenda against Terrell Eddy?
A. No, I do not.

Q. In fact on the video on July 31st you're saying that Terrell Eddy shot first, correct?

[Defense counsel]: Objection, your Honor.

THE COURT: Overruled.

A. Correct.

Q. So this isn't something you're coming up with in court here.

A. Correct.

Q. This has been your belief since July 15th when you observed the surveillance video.

A. That's what the evidence showed. Correct.

{¶58} The state and defense counsel asked a few more questions on redirect- and recross-examination. The state then rested. After the state's exhibits were admitted, defense counsel informed the court that it had another "objection." It was at that point when defense counsel first moved for a mistrial due to the fact that Detective McKay improperly gave his "interpretation of the video."

{¶59} The state argued that it was defense counsel who elicited the testimony. The court agreed and denied Eddy's motion for mistrial.

{¶60} After reviewing what occurred at trial, it is clear that defense counsel did not intentionally elicit Detective McKay's opinion as to who shot first. Defense counsel

was discussing what occurred inside the car when Detective McKay gave an unresponsive answer — stating that according to the video, it was Eddy who had a gun and shot first. But while defense counsel may not have intentionally opened the door regarding Detective McKay's opinion as to who shot first, defense counsel continued to question Detective McKay about the matter — rather than immediately move to strike or move for a mistrial. Defense counsel then waited until the state rested, and the state's exhibits were admitted, before moving for a mistrial. We find defense counsel's motion for mistrial untimely, as well as being invited error. Invited error prohibits a party from "tak[ing] advantage of an error which he himself invited or induced the trial court to make." *Lester v. Leuck*, 142 Ohio St. 91, 50 N.E.2d 145 (1943), syllabus. Defense counsel should have immediately moved for a mistrial or moved to strike Detective McKay's unsolicited response.

{¶61} Thus, we cannot say that the trial court abused its discretion when it denied Eddy's motion for mistrial.

{¶62} Eddy's fourth assignment of error is overruled.

{¶63} We do note, however, that although the trial court advised Eddy that he would be subject to three years of mandatory postrelease control for the second-degree felonious assault, it incorrectly stated five years of mandatory postrelease control in the sentencing entry. Further, although the trial court ordered Eddy to forfeit his property at the sentencing hearing, it failed to include it in the sentencing entry. Thus, although we affirm the judgment of the trial court, we remand for the limited purpose for the trial court

to correct its sentencing entry nunc pro tunc to reflect what actually occurred at the sentencing hearing.

**{¶64}** Judgment affirmed and remanded for nunc pro tunc correction of sentencing entry.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for correction and execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, JUDGE

MARY EILEEN KILBANE, P.J., and
TIM McCORMACK, J., CONCUR