[Cite as *State v. Coleman*, 2018-Ohio-4210.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 106631

---

## STATE OF OHIO

### PLAINTIFF-APPELLEE

vs.

## WILLIE J. COLEMAN

### DEFENDANT-APPELLANT

---

### JUDGMENT:
### AFFIRMED AS MODIFIED AND REMANDED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-614662-A

**BEFORE:** Blackmon, J., E.A. Gallagher, A.J., and Jones, J.

**RELEASED AND JOURNALIZED:** October 18, 2018

**ATTORNEYS FOR APPELLANT**

Harvey B. Bruner
John D. Mizanin, Jr.
Harvey B. Bruner & Company
700 West St. Clair Avenue, Suite 110
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Matthew E. Meyer
Assistant County Prosecutor
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

PATRICIA ANN BLACKMON, J.:

{¶1} Defendant-appellant, Willie J. Coleman ("Coleman"), appeals from his convictions for tampering with records, attempted aggravated theft, and extortion. He assigns the following error for our review:

Mr. Coleman received ineffective assistance of counsel.

{¶2} Having reviewed the record and pertinent law, we affirm the conviction. However, we note that Count 8 has been merged into Count 7, so we modify the sentence to so reflect that there is no fine for Count 8 and remand for issuance of a nunc pro tunc order correcting the sentencing journal entry. The apposite facts follow.

{¶3} Coleman was indicted in a 15-count indictment for tampering with records and using sham legal processes on February 3, 2016, August 22, 2016, and February 27, 2017, in connection with an alleged scheme to commit aggravated thefts against Lawrence Coven ("Lawrence"), his son, Steven Coven ("Steven"), and Steven's wife, Melissa Coven (Melissa") (collectively referred to as "the Covens"). The indictment set forth three counts of tampering with records, in violation of R.C. 2913.42(A)(1), three counts of using sham legal processes, in violation of R.C. 2921.52(B)(4), two counts of attempted aggravated theft, in violation of R.C. 2913.02(A)(1), one count of retaliation, in violation of R.C. 2921.03(A), three counts of intimidation, in violation of R.C. 2921.03(A), and three counts of extortion, in violation of R.C. 2905.11(A)(1).

{¶4} The matter proceeded to a jury trial on October 16, 2017. The state's evidence demonstrated that in 2012, Lawrence, one of the owners of Bedford Associates, leased a building to Contractor's Granite, a granite and cabinet distributor. In 2014, Lawrence met Coleman through Contractor's Granite. When Contractor's Granite's lease ended in 2015, Coleman

approached Lawrence and claimed that he had purchased the business. Believing that Coleman was now the current owner of Contractor's Granite, Lawrence offered Coleman a lease extension under which Coleman would pay $3,500 per month, or $42,000 per year. Under the terms of the lease extension, Coleman could not assert any claims against the individual partners of Bedford Associates, and was required to sue the partnership and obtain a judgment before obtaining proceeds on any claim.

{¶5} Shortly after signing the lease extension, Lawrence was called to the building after police responded to a dispute between Coleman and Contractor's Granite. Contractor's Granite informed Lawrence that Coleman did not work for them, did not purchase their business, and had no authority to sign the lease extension. After determining that Coleman had falsely represented that he purchased Contractor's Granite, Lawrence called Coleman to explain that the lease extension was of no effect. Coleman's wife claimed that Coleman had a stroke and could not communicate. Several days later, Coleman called Lawrence to inquire as to whether Lawrence had secured a new tenant for the building, and Lawrence told him that he had not, but that Coleman had no valid lease and no right to be in the building.

{¶6} In October 2015, Lawrence received an "Affidavit of Truth" from Coleman, acting under the sovereignty of the "Indigenous Moors," claiming that Lawrence had agreed to pay Coleman $42,000, in monthly installments of $3,500, in connection with the lease. Coleman also asserted that if Lawrence failed to provide "proof of National Descent," or failed to rebut the "Affidavit of Truth" to Coleman's "complete satisfaction," then Coleman could declare that he and Lawrence had entered into a "agreement by acquiescence," entitling Coleman to $42,000, plus "daily penalties of $1,000," which could be secured through various garnishments and liens on Lawrence's property.

**{¶7}** Lawrence's attorney, Michael Stavnicky ("Stavnicky") testified that even if Coleman believed he had a valid lease of Lawrence's property, this would not require Lawrence to pay Coleman; rather, it would have obligated Coleman, as tenant, to pay Lawrence, the landlord, under the terms of the lease extension. Stavnicky sent Coleman a cease and desist letter demanding that Coleman stop asserting "self-serving and outlandish demands" for money from Lawrence. In response, Coleman declared Lawrence to be in "default" for failing to adequately rebut the "Affidavit of Truth."

**{¶8}** Stavnicky sent Coleman a second cease and desist letter on November 25, 2015. Thereafter, Coleman sent Lawrence a second Notice of Default with a "non-negotiable security agreement" purportedly granting Coleman a security interest in Lawrence's "collateral."

**{¶9}** Stavnicky sent Coleman a third cease and desist letter in December 2015, but several weeks later, on February 3, 2016, Coleman filed a UCC financing statement with the Ohio Secretary of State, claiming broad security interests in Lawrence's "present and future property." Additionally, the Moabite Internatl. Group, a "private birthright defender group," sent Lawrence a notice of intent to levy. This document declared that the group would seize Lawrence's real estate, automobiles, bank accounts, income, and other property if Lawrence did not immediately tender payment of $98,000. According to the state's evidence, the UCC filings would have prevented the Covens from refinancing or selling any of the purportedly encumbered property and were aimed at attaching and levying upon all listed assets as well as Coven's income.

**{¶10}** The following month, the Moabite Internatl. Group demanded $128,000 in order to release the purported liens, and by May 2016, their demand increased to $149,000. Stavnicky informed Coleman and the Moabite Internatl. Group that their claims were false, fraudulent and "a scheme to extort money," and he ordered them to stop all communication with Lawrence. In

response, Coleman filed a complaint against Lawrence in the United States District Court for the Northern District of Ohio. This complaint was summarily dismissed by the federal court.

{¶11} On August 22, 2016, Coleman filed UCC financing statements with the Cuyahoga County Fiscal Officer, claiming broad security interests in Bedford Associate's property, in a home, "existing and future" property, accounts, and other property owned by Steven and Melissa in Summit County. Additionally, the Moabite Internatl. Group sent Steven and Melissa a notice of intent to levy on their assets if they did not immediately tender payment of $42,000.

{¶12} The following month, Bedford Associates and the Covens filed a civil action against Coleman seeking injunctive and other relief. *See Bedford Assocs. v. Coleman*, Cuyahoga C.P. No. CV-16-869226. By October 2016, the Covens obtained a temporary restraining order and a preliminary injunction rendering the purported liens unenforceable. The injunction further barred Coleman, the Moabite Internatl. Group, and entities acting in concert with them from "engaging in any financial activity, claims, liens, public filings, mortgages, UCC filings, security agreements, debts or liabilities of any kind" related to the Covens. In response, Coleman filed a pro se affidavit of disqualification against the judge in the civil matter, arguing that the judge's property had also been subject to an Indigenous Moor lien filed by Kory Kane ("Kane"), thereby biasing the court against Coleman. Coleman's affidavit of disqualification was denied by the Ohio Supreme Court. *See Bedford Assocs. v. Coleman*, 150 Ohio St.3d 1298, 2017-Ohio-7055, 84 N.E.3d 1032.

{¶13} On February 27, 2017, despite receiving the temporary restraining order and preliminary injunction, Coleman filed another UCC financing statement with the Ohio Secretary of State, claiming security interests in properties and accounts owned by the Covens. According

to Lawrence, the value of the properties listed in the UCC filings vastly exceeded the amount that Coleman claimed Lawrence owed from the failed lease extension.

{¶14} Brian O'Malley ("O'Malley"), the transfer and recording administrator for the Cuyahoga County Fiscal Office, testified that UCC filings related to real property must be filed with the Ohio Secretary of State. The county fiscal office accepts for filing UCC filings related to fixtures, and other documents meeting the requirements of the Ohio Revised Code, unless certain indicators of fraud are apparent, i.e., those with notary issues or those containing spurious attachments. In addition, the county fiscal office generally rejects filings prepared under the auspices of individual sovereignty groups where they are based upon claims that are outside of the Revised Code.

{¶15} Allison DiSantis ("DiSantis"), the director of business services for the Ohio Secretary of State, testified that some individuals affiliated with "sovereign movements" falsely file UCC documents listing themselves as creditors of people with whom they have disputes. However, UCC filings, even if bogus, are public record and may be accepted for filing, and individuals who are the subject of fraudulent UCC filings generally have to obtain a court order to remove false filings. DiSantis opined that Coleman's February 3, 2016 UCC filing in this matter appeared to be a nonsensical document, but the office merely received the filing and did not determine its validity.

{¶16} Cuyahoga County Sheriff's Detective Tom Roberts ("Det. Roberts") testified that he has dealt with individual sovereignty groups in the past, and a hallmark of such groups is the belief that they are not subject to the prevailing laws or have additional rights not recognized in the prevailing law. According to Det. Roberts, Antwan Wilson ("Wilson") is a member of an

individual sovereignty group who has used his address, 9500 Wade Park, for correspondence pertaining to the "Indigenous Moors," group.

{¶17} At the close of the state's case, the trial court denied Coleman's motion for acquittal, and Coleman testified on his own behalf. Coleman stated that Lawrence approached him at the end of Contractor's Granite's lease and offered to give him a lease extension if he would remain at the building. Coleman signed the extension, but after the dispute with Contractor's Granite, he asked the Moabite Internatl. Group to intercede and help him "recoup his damages" against Lawrence. Coleman claimed that he followed the recommendations of the Moabite Internatl. Group in dealing with the Covens when he sent the "Affidavit of Truth." This document warned the Covens of potential liens if they failed to respond. Coleman maintained that he engaged in a constitutional administrative process in this matter and was entitled to file the liens when he failed to receive responses from Lawrence, Melissa, or Steven. Coleman also stated that the individuals in the Moabite Internatl. Group are very law-abiding. He admitted that he knows Wilson as "King," but he stated that he did not learn until the trial that Wilson's address appeared on the Moabite Internatl. Group's collection letters. Coleman also admitted that the judge in the civil case explained to him that the liens were not lawful and that he was prohibited from filing them. Later, after contempt proceedings were filed against him in the civil case, Coleman removed the liens.

{¶18} Coleman was convicted of all charges. The trial court obtained a presentence report and a mitigation of penalty report, and also merged various offenses. Ultimately, Coleman was convicted of two counts of tampering with records, attempted aggravated theft, and three counts of extortion. The court sentenced Coleman to five years of imprisonment, with

three years of mandatory postrelease control and three years of optional postrelease control, and imposed fines for each set of offenses, but stayed all but $10,000.[1]

### Ineffective Assistance of Counsel

{¶19} In his sole assigned error, Coleman asserts that he was deprived of the effective assistance of trial counsel when his attorney failed to object to the state's evidence pertaining to: the motion to disqualify the judge who presided over the civil proceedings; the reference to the Indigenous Moor lien filed by Kane; Coleman's sanction for contempt in the civil case; Coleman's question about the trial judge's nationality; and Coleman's association with the Indigenous Moors, member Empress Candace ("Candace"), and Kane. Coleman also complains that his trial counsel failed to conduct redirect examination in order to permit him to explain his vision difficulties, his association with the Indigenous Moors; his belief that he could not file a traditional lawsuit against Lawrence; and that he took a course of action recommended by the Indigenous Moors after they convinced him to use the "administrative procedure."

{¶20} We review a claim of ineffective assistance of counsel under a two-part test that requires the defendant to demonstrate: (1) trial counsel's performance fell below an objective standard of reasonable representation; and (2) prejudice arose from the deficient performance. *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶21} In evaluating an alleged deficiency in performance, our review is highly deferential to counsel's decisions as there is a strong presumption counsel's conduct fell within the wide

---

[1]In this connection, we note that the convictions on Counts 6-8 were merged into Count 7, but the trial court imposed fines on Counts 7 and 8. Accordingly, we must remand for nunc pro tunc correction of the sentence to reflect that there is no fine on Count 8.

range of reasonable professional assistance. *Bradley* at 142-143, citing *Strickland* at 689. Reviewing courts are to refrain from second-guessing the strategic decisions of trial counsel. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). Debatable trial tactics, generally do not constitute a deprivation of effective counsel. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 288.

{¶22} To show prejudice, a defendant must prove that the lawyer's deficiency was so serious that there is a reasonable probability the result of the proceeding would have been different. *Strickland* at 694. The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *State v. Frazier*, 61 Ohio St.3d 247, 254, 574 N.E.2d 483 (1991).

{¶23} In considering a defendant's claim that his trial counsel was ineffective for failing to object to evidence presented by the state, we note that the failure to make objections is not alone enough to sustain a claim of ineffective assistance of counsel. *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185,¶ 117, citing *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 103. The Ohio Supreme Court has explained:

> "experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."

*State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir.2006).

**{¶24}** Moreover, a lawyer will not be deemed ineffective for failing to object to evidence that was properly admissible under Evid.R. 402, 403, and 404. *See generally State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 71-75. *See also State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 209-214. The Ohio Supreme Court has rejected ineffectiveness claims based upon failure to object to evidence where the evidence was admissible and relevant to the nature and circumstances of the case. *See Conway* at ¶ 109; *State v. Jones*, 91 Ohio St.3d 335, 355, 744 N.E.2d 1163 (2001).

**{¶25}** Here, Coleman's pro se motion to disqualify the judge who presided over the civil proceedings cited the judge's experience with a similar lien filed by Kane. This motion was therefore admissible because it was relevant not only to the nature and circumstances of the instant case, but was also probative of Coleman's claim that he merely followed the advice of the Indigenous Moors and did not act of his own intent.

**{¶26}** Likewise, the evidence pertaining to the contempt proceedings in the civil case was probative of the nature and circumstances of this matter in order to show Coleman's intent and plan. The evidence demonstrated that Coleman had been told that the "administrative procedure" was an unlawful procedure for asserting a claim to another's property, yet subsequently filed a UCC financing statement.

**{¶27}** Similarly, evidence pertaining to Coleman's questions about the trial judge's nationality was also relevant to the nature and circumstances of the offense, and was admissible. It was probative of Coleman's intent and plan to employ unlawful and sham processes, as a claimed prerogative of individual sovereignty, because the "Affidavit of Truth" demanded to know Lawrence's nationality or face a "default."

**{¶28}** Evidence concerning Coleman's associations with the Indigenous Moors was also relevant, probative, and admissible because the "Affidavit of Truth" referenced the Indigenous Moors. Further, according to Coleman, he believed the "administrative process" that he learned from the Indigenous Moors authorizes the taking of property where an "Affidavit of Truth" is unrebutted. (Tr. 504.) Additionally, Coleman's association with Wilson was probative and relevant to the nature and circumstances of this case because Wilson's address appeared on the Moabite Internatl. Group's escalating demands for payment from the Covens. Finally, evidence of the indictments brought against Indigenous Moor members Kane, Wilson, and Candace were fair subjects of cross-examination because Coleman testified that these individuals are members of the group, that they are law-abiding, and the UCC filings are proper "administrative" proceedings for the levying of property. Moreover, defendant's trial counsel could have reasonably decided to refrain from objecting to this line of inquiry because it was compatible with Coleman's defense that he followed the advice of the Indigenous Moors in placing the liens and making his demands for payment, and was "led down a path" by Wilson without being "fully cognizant of what was unfolding." (Tr. 616-619.)

**{¶29}** Turning to the issue of defense counsel's failure to conduct redirect questioning following Coleman's cross-examination, we conclude that all of the topics that Coleman now claims should have been probed were in fact extensively covered through the course of the trial. Furthermore, Coleman's trial counsel could have reasonably concluded that additional redirect questioning would have opened the door to additional damaging re-cross-examination.

**{¶30}** Accordingly, after thoroughly reviewing the record, we conclude that counsel made reasonable tactical decisions in this matter and was not ineffective. Moreover, there is nothing

in the record to demonstrate that the outcome of the trial would have been different if the disputed tactical decisions had been different.

**{¶31}** The assigned error is without merit.

**{¶32}** Judgment is affirmed, sentence is modified, and case is remanded for nunc pro tunc correction of the sentence to reflect that there is no fine on Count 8.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

PATRICIA ANN BLACKMON, JUDGE

EILEEN A. GALLAGHER, A.J. and
LARRY A. JONES, SR., J., CONCUR